# CASES

IN THE

# SUPREME COURT

ON APPEALS FROM THE

## COURT OF CHANCERY

---

G. W. BAKER MACHINE COMPANY,
Defendant below, Appellant,

*vs.*

U. S. FIRE APPARATUS COMPANY,
Complainant below, Appellee.

*Supreme Court, on appeal, April 24, 1916.*

Under *Revised Code* 1915, § 3844, providing that the Chancellor shall not have power to determine any matter wherein sufficient remedy may be had by common law or statute before any other court of the State, the doctrine of mutuality of remedy in relation to specific performance of a sale of personalty cannot be recognized because of the limitation on the power of the Court of Chancery imposed by Constitution and the statutes, the right of a contracting party to specific performance depending solely on the lack of an adequate remedy at law, inadequacy of remedy being the necessary condition to equitable relief.

A contract for the sale of shares of corporate stock may be specifically enforced if the complainant has no adequate remedy at law, as where its value cannot be so ascertained by computation, or by any sufficiently certain estimate, to make a suit at law for damages an adequate remedy.

The vendor of goods is entitled to recover damages for the vendee's refusal to accept or pay only to the extent of actual injuries from the breach of contract, which is ordinarily the difference between the contract price and the market value at the time and place of breach, a difference

which may be estimated and fixed by a re-sale within a reasonable time, after notice to the vendee, of the intention to re-sell, taking all proper measures to secure as fair and favorable a sale as possible.

Where the buyer of stock in a corporation, the only property of which was patents, plans, a few machines, etc., refused to perform, the seller could have offered the stock and property at public sale, and then recovered in an action at law the difference between the value of the stock, as thus ascertained, and the contract price, thus having an adequate remedy at law for the breach precluding specific performance of the contract.

Appeal From Court of Chancery. The facts appear in the opinion of the Court. For report of the case below, see 10 *Del. Ch.* 241.

Argued before Pennewill, C. J., and Boyce, Conrad, Rice and Heisel, J. J.

*William S. Hilles*, for the appellant.
*Charles F. Curley*, for the appellee.

Pennewill, C. J. (delivering the opinion of the court). A bill for the specific performance of a contract for the purchase of eighteen hundred shares of the stock of the Diamond Manufacturing Company was filed by the complainant against the defendant in the Court of Chancery in New Castle County. The prayer of the bill is, that the respondent be decreed to specifically perform its contract with the complainant to accept the assignment of the stock, and deliver therefor to the said complainant the sum of fifty-two hundred and eighty dollars in the manner provided by said contract.

After one or more meetings between Mr. Mode of the Baker Company and James J. English, and numerous meetings between Mr. Jones, Mr. Mode and Mr. Baker, a letter was written by the Baker Company to James J. English as follows:

"October 9, 1913.

"Jas. J. English, City.—Dear Sir: Mr. Wm. J. Jones has submitted to us your offer to sell us 1800 shares of the capital stock of the Diamond Mfg. Co., a corporation of the State of Delaware. The price seems to us

high considering the limited claims that Mr. Jones is going to be able to secure on his machine. However, we will buy these shares with the understanding that there has so far been issued only 3,000 shares of the stock of this Company, and that you guarantee the Company to be free of all indebtedness. With this purchase of stock we are to receive all books of the Company, all drawings, patterns and templates pertaining to the building of the Jones Seasoning Machine, as well as the machine now at the Delaware Leather Co.'s and the first machine built. For this, we agree to pay you the sum of $5,000, as follows: In cash, $500.00; 3 notes, $1,500.00 each, at two, four and six months. Settlement to be made as soon as our Attorney can examine papers in the matter, and have agreements drawn between Mr. Jones and ourselves.

"Trusting the above will meet with your approval, we beg to remain,

"Very truly yours,

"G. W. Baker Machine Co.,

"Geo. W. Baker,

"President."

On the same day another letter was written by the Baker Company to English agreeing to increase the cash payment to seven hundred and eighty dollars.

These two letters, with the acceptance of the complainant, constituted the contract, the specific performance of which the Chancellor was asked to decree.

The capital stock of the Diamond Manufacturing Company amounted to three thousand shares of the par value of one hundred dollars each, and was issued to William J. Jones in payment for an application for a patent for improvement in machines for treating skins, filed by the said Jones in the Patent Office at Washington. No cash was ever paid into the treasury of the Diamond Manufacturing Company, neither did it have at any time any assets excepting one machine, parts of another machine, certain drawings, patterns and templates, and the application for the patent referred to.

On the ninth day of October, 1913, the date of the contract in question, the Diamond Manufacturing Company was indebted to the U. S. Fire Apparatus Company, the complainant, which indebtedness was unpaid at the time of the filing of its bill.

Jones, the alleged inventor of the machine above mentioned, was employed by F. F. Slocomb and Company as a

toolmaker in their works. He had access to all the methods of manufacturing seasoning machines employed by the Slocomb Company, and about six months after entering the employment of that company began working upon the invention afterwards acquired by the Diamond Manufacturing Company.

The Slocomb Company, learning that the Baker Company was contemplating the development of the Jones machine, consulted their attorneys, Messrs. Wiedersheim and Fairbanks, who on October 14, 1913, wrote a letter to the Baker Company, stating that the Jones invention was an infringement of the Slocomb patent, and notifying the Baker Company that it would be held responsible for any transactions based upon the Jones claims. Mr. Fairbanks testified that after an examination of the Jones appliance he came to the conclusion that it was an infringement upon the Slocomb patent, and was instructed by Mr. Slocomb, the president of the company, to take proceedings to prevent its manufacture and sale by the Baker Company.

It is contended by the complainant that the officers of the defendant company had examined the Jones invention, were familiar with the Slocomb patents, and were sufficiently experienced to know the effect of one patent on the other. The defendant denies that before agreeing to buy the stock in question, it had made much of an examination of the Jones invention, or was sufficiently familiar with it to determine the question of infringement, and insist they had no reason to believe it was an infringement until they received the letter from Wiedersheim and Fairbanks above mentioned. This is one of the disputed facts in the case.

The defendant admits that proir to October 9, 1913, Mr. Mode and Mr. Baker, officers of the Baker Company, and who had had years of experience in the manufacture of leather-working machines, made some examination of the Jones invention, and a few days prior to October 9, 1913, went with Jones to Houston and Houston, his patent attorneys, where they received assurances that certain of the Jones claims were valid and patentable; and after the receipt of the letter from Wieder-

sheim and Fairbanks they again conferred with Jones' attorneys in relation to the same matter.

It does not appear that any patent has ever been allowed or issued by the Patent Office upon Jones' application.

The defendant company, believing, or claiming, there was danger that the Jones invention would be held to be an infringement of the Slocomb patent, wrote a letter to James J. English on October 26, 1913, which stated that the defendant had been notified that the Jones invention was an infringement on other patents, that suits would be instituted to determine this question and for an accounting for the machines already built, and concluded as follows:

"Under these circumstances it is impossible for us to go further in the matter in view of the fact that the company was to be turned over to us free of obligations. We therefore must decline to proceed further, and to withdraw our offer as it was conditioned upon our being satisfied that the Diamond Manufacturing Company was clear from any indebtedness or obligations other than those of which we were familiar."

It is not disputed that the Jones claim for a patent had been assigned to the Diamond Manufacturing Company in exchange for all the capital stock of three thousand shares, except the shares necessary to qualify directors; that it was created to hold the patents, and had no other asset and did no business. Of its shares twelve hundred were held by Jones, seventeen hundred and ninety-four by the complainant, the remaining six by directors, and all but those held by Jones were held for the complainant company. It is not denied that James J. English, with whom, or through whom, the contract in question was made was, at the time, the Secretary, Treasurer and General Manager of the complainant company.

Upon the receipt by English of defendant's letter of October 20, 1913, the U. S. Fire Apparatus Company filed a bill for the specific performance of the contract made by the defendant with English.

Another disputed fact in the case is whether Mode, who conducted the negotiations on behalf of the defendant for the

purchase of the stock knew that English was acting for the complainant company at the time.

After hearing and considering the case the Chancellor entered a decree requiring the defendant to accept a certificate for eighteen hundred shares of the Diamond Manufacturing Company, and pay to the complainant the sum of five thousand two hundred and eighty dollars, the time for the payment of instalments, as stated in the contract, having expired; and that before being required to do so the complainant should deliver to the defendant its guaranty against all indebtedness due from the Diamond Manufacturing Company, and a full acquittance of all claims against said company, and deliver to the defendant the books, machines and other matters mentioned in the letters of October 9, 1913.

It is argued by the defendant that complainant is not entitled to the relief asked for because,

1. A court of equity cannot decree the specific performance of a contract for the purchase of shares of stock in any event, and certainly not if the vendor has an adequate remedy at law as in this case.

2. The contract was made with James J. English and not with complainant.

3. The agreement to purchase the shares of stock was conditioned upon a guaranty that the Diamond Manufacturing Company, the owner of the stock, was free from all indebtedness, where it was not so in fact.

4. It was inequitable to require the defendant to perform the contract in question.

All of appellant's assignments of error are comprehended within the four points mentioned, and they will not be more specifically considered by the court.

The doctrine of mutuality of remedy, which has been recognized by some textwriters, as well as in a few cases in this country, and upon which the complainant relies to some extent in the present case, cannot be recognized in this State because of the limitation on the powers of the Court of Chancery imposed by the constitution and statute which conferred its general powers.

That when one party to a contract concerning the sale of personal property has a right to specific performance the other party has the same right in case of breach, is a proposition which the complainant contends is supported by reason as well as authority. But we think it has not been sustained in any jurisdiction where the powers of the Chancellor are so limited as in this State. We are clearly of the opinion that in view of the limited or prohibited powers of the Chancellor here, the right of a contracting party to specific performance must depend *solely* upon the lack of an adequate remedy at law. If the party seeking redress has such remedy he cannot have specific performance, because it is provided by statute, *Code Section* 3844, "That the Chancellor shall not have power to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State; but that where matters determinable at common law shall be brought before him in equity, he shall remit the parties to the common law."

So, it is clear that the right to the equitable relief of specific performance in this State depends, in any case, not upon mutuality of remedy, but the inadequacy of an action at law.

The remedial test is not mutuality, but inadequacy.

We do not say there can be no case in which the vendor of personal property would be entitled to a decree of specific performance; but the doctrine of mutuality of remedy seems to be both illogical and unreasonable, and we very much doubt that it could be of general application anywhere, because, as Mr. Pomeroy says (6 *Eq. Jur.* 769): "It is open to so many exceptions that it is of little value as a rule." We quote from *Eckstein v. Downing,* 64 *N. H.* 249, the following very clear statement of the law:

"Specific performance of contracts in regard to personal property is decreed only where the vendor stands in need of the specific relief which a court of equity only can give. Indeed, in this respect there is no distinction between real estate and personal estate. * * *

"Equity enforces specific performance where there is no adequate remedy at law. This is the ground of this branch of equity jurisdiction, and it is not consistent with the mutuality of remedy. * * * The

mutuality required is that which is necessary for creating a contract enforceable on both sides in some manner, but not necessarily by specific performance."

Our conclusion upon this branch of the case is, that the vendor was not entitled to a decree of specific performance because of mutuality of remedy, that is, because the vendee would have been entitled to such decree if the vendor had failed to perform his contract. On the contrary, we hold that if the complainant was entitled to a decree of specific performance at all it was solely because he did not have an adequate remedy at law.

In holding that a contract concerning the sale of shares of stock may be specifically enforced if the complainant has no adequate remedy at law, we are not in conflict with the decision rendered by Chancellor Saulsbury in *Diamond State Iron Co. v. Todd, et al.*, 6 *Del. Ch.* 163, (and affirmed by the Court of Errors and Appeals without opinion,) in which he said:

"But in the United States all such securities are ordinarily purchasable in the market; and the rule is settled by the weight of authority, although there are some cases to the contrary, that contracts concerning stocks and bonds of corporations, like those concerning government securities, will not be specifically enforced."

Manifestly the Chancellor did not mean that in no case would a contract concerning shares of stock be specifically enforced. He meant that it would not be done where the stock was purchasable in the market or its value could be proved; and this was practically the same as saying, that a contract concerning stocks would not be specifically enforced if the complainant had an adequate remedy at law. Very significant are the concluding words of the Chancellor's opinion in that case, viz:

"But the means of determining the damages which Todd had suffered * * * are abundant in a court of law. It there would be perfectly competent for him to avail himself of the testimony of every one of the eight or ten shareholders in the company to prove the value of the stock at the time of the alleged contract of purchase, and he himself, as the law of this State now is, might become a witness in respect thereto.

There certainly would be no denial of justice should Todd's case be heard by an honest jury who might assess such damages as they believed him to have justly sustained."

In using this language the Chancellor had reference to the argument,—that the stock in question was the stock of a particularly close corporation, which did not permit the value of its stock to be quoted in the market, that the stock had no market value, and could not therefore be substituted by the purchase of similar amount in the market.

The construction we have placed upon the opinion of the Chancellor in the Todd case makes it entirely consistent with the earlier case of *Satterthwaite v. Marshall,* 4 *Del. Ch.* 337, in which it was held that a contract concerning personal property might be specifically enforced, "where its value cannot be so ascertained by computation, or by any sufficiently certain estimate, to make a suit at law for damages an adequate remedy for breach of covenant to assign the right."

This is the true test of the jurisdiction of a court of equity for specific performance.

There can be no doubt about the law of specific performance in this State, but very often there is doubt and difficulty respecting its application to the particular case.

Did the complainant, at the time the defendant gave notice of its intention not to carry out its agreement, have an adequate remedy at law for the breach? There was much said on both sides of this question at the argument.

Mr. Sutherland in speaking of the refusal of a vendee to accept goods or pay for the same says:

"In such case the vendor is entitled to recover damages only to the extent of his actual injury from the failure of the vendee to fulfil his contract, which is ordinarily the difference between the contract price and the market value at the time and place of breach, with interest." *Vol.* 3, *Sec.* 647.

This textwriter also says:

"The difference between the contract price and the market value may be ascertained and fixed by a re-sale within a reasonable time, and after

notice to the vendee of the vendor's intention to re-sell, taking all proper measures to secure as fair and favorable a sale as possible."

This we think is a very clear and correct statement of the law.

Certainly the complainant could have offered at public sale the shares of stock, together with all books of the company, all drawings, patterns and templates pertaining to the building of the Jones seasoning machine, as well as the machine then at the Delaware Leather Co's. and the first machine built. These are the things the defendant bought and would have been entitled to receive if its agreement had been carried out. The value of this property, as ascertained by such sale might have been very small, but it would have been one way of fixing its value within the meaning of the law. The defendant could then have recovered in an action at law the difference between the value as thus ascertained and the contract price, provided the defendant had no legal defense to the action. And in such a proceeding all disputed questions could be determined by a jury.

The complainant's bill was filed to recover money for property sold to the defendant, and not to compel the performance of some act that a court of law could not enforce. The decree prayed for, and made, was a decree for the payment of money for property which the defendant had agreed to accept at a certain price.

We can see no reason why this case should be excepted from the general rule. The court are clearly of the opinion that the Chancellor properly held, under the evidence before him, that the complainant had a right to enforce against the defendant the contract made apparently with English alone. We affirm the Chancellor's decision upon that point for the reasons he gave. But, for the reason that the complainant had, at the time it filed its bill, an adequate remedy at law, the court are of the opinion that specific performance of the contract by the defendant should not have been decreed.

The decree of the Chancellor is, therefore, reversed.