EDITH CONWAY RINGLING,

*vs.*

RINGLING BROS.—BARNUM & BAILEY COMBINED SHOWS, INC., a corporation of the State of Delaware, JAMES A. HALEY, AUBREY B. HALEY, JOHN RINGLING NORTH, JAMES R. GRIFFIN, GEORGE WOODS, ROBERT E. RINGLING, and W. P. DUNN, JR.

*New Castle, November 4, 1946.*

*Clair J. Killoran* (of Killoran & Van Brunt), of Wilmington [John Van Brunt, Jr., and F. William Carr (of Killoran & Van Brunt), of Wilmington, and Dan Gordan Judge and John F. Reddy (of Engel, Judge & Miller), of New York City, of counsel], for petitioner.

*Aaron Finger* (of Richards, Layton & Finger), of Wilmington [Leonard G. Bisco, George B. Balamut and William J. Granger (of Newman & Bisco), of New York City, of counsel], for defendants.

SEITZ, Vice-Chancellor: Petitioner in this proceeding contests the validity of the election of directors and officers of the defendant corporation which took place at its annual stockholders' and directors' meetings held this year.

At all times here involved, the 1000 shares of authorized and issued common stock of the defendant corporation, Ringling Bros.-Barnum & Bailey Combined Shows, Inc. (hereafter called the "defendant corporation" or the "corporation"), were owned or controlled as follows:

Edith Conway Ringling—petitioner—315 shares
Aubrey B. Haley—a defendant—315 shares
John Ringling North—a defendant—370 shares.

These shares of stock which possessed cumulative voting rights were all registered in the individual names of the parties set forth above, or in their names in a representative capacity. It is undisputed, however, that these parties were the beneficial owners of the number of shares recited.

The other individual defendants are named because they constitute the remaining persons whose title to office is brought into question by this proceeding. Since certain of the named defendants are obviously sympathetic to petitioner's case, I shall, when referring to "defendants", intend to encompass only those whose position is truly antagonistic.

The defendant corporation's certificate of incorporation provides for a board of seven directors and its by-laws require the holding of the annual stockholders' meeting at the corporation's offices in New York City, or such other place as should be designated in the notice of meeting. The circus business operated by the defendant corporation forms a well-known feature of the American scene. All the stockholders and all the other persons involved in this litigation are intimately connected with the affairs of the corporate defendant.

On or about September 15, 1941, the petitioner, Edith Conway Ringling, and the defendant Aubrey B. Haley (then Aubrey B. Ringling) admittedly executed in Evanston, Illinois, a writing entitled "Memorandum of Agreement", dated September 15, 1941. Since the entire controversy before the court revolves around the legal efficacy, if any, of the Memorandum of Agreement (hereafter called "Agreement"), it is necessary to narrate the substance of the provisions of this Agreement somewhat at the expense of brevity.

The Agreement recites that each of the two parties owned 300 shares of the defendant corporation's stock and 300 shares of stock of Circus City Zoological Gardens, Incorporated (hereafter called "Circus City"); that certificates therefor were on deposit under a voting trust agreement dated June 24, 1938, and that the parties held voting trust certificates therefor. It is further recited that the certificates representing the 600 shares of Circus City stock were on deposit as collateral security with the John Ringling Estate to secure the payment of a note executed by the two corporations, and held by that Estate, and that upon its payment, the parties would each be entitled to voting trust certificates representing 300 shares of stock. Further, it is set forth that each party also owned individually 15 shares of stock in each of the named corporations.

The Agreement then says that the voting trust agreements will terminate October 22, 1947, or earlier, should the corporation pay the promissory note heretofore mentioned, and should the corporate defendant pay a certain designated indebtedness which it had incurred. Finally, it is recited that the parties in April 1934 entered into an agreement providing for joint action in matters affecting their ownership of stock and interest in the corporate defendant, and that the parties desired to continue to act jointly in all matters relating to their stock ownership or interest in both the corporate defendant and Circus City.

After setting forth the recitals mentioned, the Agreement then provides:

"NOW THEREFORE, in consideration of the mutual convenants and agreements hereinafter contained the parties hereto agree as follows:

"1. Neither party will sell any shares of stock or any voting trust certificates in either of said corporations to any other person whomsoever, without first making a written offer to the other party hereto of all of the shares or voting trust certificates proposed to be sold, for the same price and upon the same terms and conditions as in such proposed sale, and allowing such other party a time of not less than 180 days from the date of such written offer within which to accept same.

"2. In exercising any voting rights to which either party may be entitled by virtue of ownership of stock or voting trust certificates held by them in either of said corporations each party will consult and confer with the other and the parties will act jointly in exercising such voting rights in accordance with such agreement as they may reach with respect to any matter calling for the exercise of such voting rights.

"3. In the event the parties fail to agree with respect to any matter covered by paragraph 2 above, the question in disagreement shall be submitted for arbitration to Karl D. Loos, of Washington, D. C., as arbitrator and his decision thereon shall be binding upon the parties hereto. Such arbitration shall be exercised to the end of assuring for the respective corporations good management and such participation therein by the members of the Ringling family as the experience, capacity and ability of each may warrant. The parties may at any time by written agreement designate any other individual to act as arbitrator in lieu of said Loos.

"4. Each of the parties hereto will enter into and execute such voting trust agreement or agreements and such other instruments as, from time to time they may deem advisable and as they may be advised by counsel are appropriate to effectuate the purposes and objects of this agreement.

"5. This agreement shall be in effect from the date hereof and shall continue in effect for a period of ten years unless sooner terminated by mutual agreement in writing by the parties hereto.

"6. The agreement of April 1934 is hereby terminated.

"7. This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns of the parties hereto respectively."

By the time the annual stockholders' meeting took place in 1943 the corporate indebtedness mentioned had been paid in full and the real owners of the shares had regained complete control of the election of directors. At the 1943, 1944, and 1945 stockholders' meetings the parties to the Agreement voted together and by virtue of their ownership of a majority of the stock and the cumulative voting provisions thereof, they elected five out of the seven directors on each occasion.

While the parties to the Agreement had their troubles, at no time prior to the stockholders' meeting here involved was it necessary to invoke what I may denominate as the "coercive" terms of the Agreement whereby the arbitrator directed how the stock should be voted. It is undisputed that for some time prior to the 1946 stockholders' meeting, which is here being reviewed, numerous efforts had been made to arrive at an understanding as to how the parties to the Agreement would vote their shares at the 1946 meeting. Just who was the moving spirit in these negotiations is unimportant. The fact is that no agreement on this point was reached although the negotiations continued up until almost midnight of the night before the annual meeting. The so-called "arbitrator" named in the Agreement, one Karl D. Loos, of Washington, D. C., was very active in these negotiations in an attempt to procure a satisfactory

solution, or at least to procure a postponement of the meeting until some solution could be evolved.

Defendants seek to make the point that Mr. Loos was not truly impartial in these negotiations, but, if it be important, I find such a contention unsupported by the record. A person desirous of reconciling parties on a substantial issue cannot be expected to convey to each one all the statements and actions of the other. In such a situation frankness has its place, but so does tact. On the other side, petitioner contends that Mr. Haley as proxy for his wife agreed to a postponement of the meeting and that such agreement was acted upon by the petitioner to her detriment, in that attempts to reach an agreement were broken off. In view of my conclusion, I think it is unnecessary to make a finding of fact on this point.

I shall not narrate the specific facts in connection with the holding of the annual stockholders' meeting here reviewed, as well as the election of directors and officers and the election of an executive committee and the fixing of salaries. The facts are not in dispute. In each instance Loos, acting as arbitrator pursuant to the Agreement, upon the request of petitioner's representative and upon a showing that the parties were unable to agree as to how their shares should be voted, directed that the shares held by the parties to the Agreement should be voted by their holders in a particular manner. When Haley, as proxy for Mrs. Haley, the other party to the Agreement, refused to follow the instructions given by Loos that the stock be voted for an adjournment and the meeting continued, the arbitrator Loos then directed that the stock of the two parties should be voted for five named nominees for directors (Edith Conway Ringling, Robert Ringling, William P. Dunn, Jr., Aubrey B. Haley and James A. Haley). Mr. Haley as proxy for his wife, contrary to the instructions of Loos, voted all his wife's shares for the election of Aubrey B. Haley and James A. Haley.

Petitioner preserved her rights before participating in each of the several matters which came before the stockholders' and directors' meeting so that this case must be decided on its merits.

Preliminarily, I shall in this opinion designate Loos as arbitrator because he is so identified in the Agreement. However, it is to be understood that the term is used only for identification purposes, and its legal effect must be determined in the light of the subsequent discussion herein dealing with the arbitration features of this case.

It is at once apparent that the right of Loos to direct the voting of the stock of the parties to the Agreement is the crucial point for decision. The determination of this point depends upon the answer to the broader question of the legality of the Memorandum of Agreement dated September 15, 1941, under which he purported to operate.

Is the September 15, 1941 Agreement enforceable under the facts presented? In order to answer the question posed it is first necessary to answer the following questions:

1. What law governs the validity of the Memorandum of Agreement?

2. Is such an Agreement valid under the controlling law?

The parties are not in agreement as to the controlling law. Defendants say the Delaware law must control because the contract deals with the voting power of stockholders of a Delaware corporation. Petitioner argues on the other hand that the law of Illinois, where the contract was executed, or the law of New York, where she contends it was to be performed, governs the validity of the Agreement. Petitioner further contends that in any event if the law of Delaware governs, the Agreement is legally enforceable under such law.

In order to determine the applicable law, it is necessary

to consider the nature of the Agreement involved. It can be simply stated. While one of the recitals in the Agreement speaks of joint action of the parties with respect to "all matters relating to their stock ownership or interest in Ringling Bros.-Barnum & Bailey Combined Shows, Inc., * * *" it is significant that the joint action is limited in the body of the Agreement to the voting of the stock. Moreover, paragraph 3 of the Agreement, which provides for a decision by the arbitrator Loos as to how the stock should be voted in the event the parties are unable to agree, is explicitly confined to disagreements as to how their stock should be voted.

It is fair, therefore, to characterize the Agreement as one dealing with the voting rights of stockholders of a Delaware corporation. It appears to be settled, and is an almost necessary rule of convenience, that in such a situation the validity of an agreement affecting such voting rights is tested by the law of the state of incorporation, in this case Delaware. *Bouree v. Trust Francais, etc., Franco-Wyoming Oil Co.*, 14 *Del.Ch.* 332, 127 *A.* 56; *Hodgman v. Atlantic Refining Co.*, (*D.C.Del.*) 2 *F.2d* 893; see also *Restatement, Conflict of Laws*, §§ 182, 183. Thus, the nature of the subject matter of the Agreement renders the usual rule governing the validity of contracts inapplicable and as a consequence, neither the Illinois nor the New York law is controlling here.

Having concluded that the Delaware law must be applied to test the validity of this Agreement, it is next pertinent to examine defendants' contentions that the Agreement is unenforceable under Delaware law because it is only "an agreement to agree," or because it involves an attempted delegation of irrevocable control over voting rights in a manner which is against the public policy of this state.

Do we have here only "an agreement to agree," by which defendants mean that there exists no legally enforceable obligation?

Preliminarily, I think it clear that the mutual promises contained in the Agreement constitute sufficient consideration to support it. The mutual restraints on the actions of the parties with respect to the sale and voting of their stock comply with the consideration requirements of contract law.

Did the parties only agree to agree? Certainly the parties agreed to agree as to how they would vote their stock, but they also provided that they would be bound by the decision of a named person in the event they were unable to agree. Thus, an explicitly stated consequence follows their inability to agree. This consequence is conditioned upon the existence of a fact which is objectively ascertainable by the so-called arbitrator as well as a court of equity, namely, that the parties are in disagreement as to how their stock should be voted. The Agreement to agree has, therefore, provisions which are capable of being enforced with respect to particular facts. Moreover, the very nature and object of the Agreement render it impossible for the parties to do more than agree to agree, and to provide an enforceable alternative in the event no agreement is reached.

Defendants urge that no standard is provided in the Agreement for the guidance of the parties in reaching an agreement and that the purposes and policies which should guide them are not set forth and cannot be foretold. The Agreement does perhaps leave something to be desired in the way of explicitly setting forth the function and purpose of the Agreement for the guidance of the parties. However, I think it clear that the same language which is expressed as the standard by which the arbitrator should act must necessarily be read as the governing standard for the parties. This language provides:

"* * * Such arbitration shall be exercised to the end of assuring for the respective corporations good management and such participation therein by the members of the Ringling family as the experience, capacity and ability of each may warrant. The parties may

at any time by written agreement designate any other individual to act as arbitrator in lieu of said Loos."

It is quite evident that no agreement could set forth explicit guides to govern the parties because it is impossible in the nature of things to anticipate all the various subjects on which the vote of the stockholders might be required. Moreover, there is no reason to believe that the arbitrator would be expected to apply a different guiding principle in arriving at a decision than that which would guide the stockholders who agreed to submit to such arbitration.

I conclude that the Agreement is sufficiently definite in terms of the duties and obligations imposed on the parties to be legally enforceable on the state of facts here presented.

Turning to defendants' second objection, is the Agreement invalid as an attempted delegation of irrevocable control and voting rights in a manner which is against the public policy of this state? The answer to the question must depend upon the answer to two questions of a more explicit character, namely:

(1) Is the Agreement a voting trust agreement in which event it would admittedly be invalid for failure to comply with the statutory requirements of this state governing voting trusts?

(2) If not a voting trust agreement, is it, nevertheless, invalid as being against public policy because of the provision that the parties shall be bound by the instructions of the arbitrator as to how they shall vote in the event of a disagreement?

Section 18 of our *General Corporation Law, Rev. Code* 1935, § 2050, provides the exclusive method for creating voting trusts of stock of a Delaware corporation, *Appon, et al. v. Belle Isle Corporation, et al., ante p.* 122, 46 *A.* 2d 749, affirmed by Supreme Court of Delaware, September 13, 1946. Does the present Agreement create a voting trust as

that term is employed in *Section* 18? This court in *Peyton v. William C. Peyton Corporation, et al.,* 22 *Del.Ch.* 187, 199, 194 *A.* 106, 111 (reversed on other grounds 23 *Del.Ch.* 321, 7 *A.2d* 737, 123 *A.L.R.* 1482), has thus described a voting trust:

"A voting trust as commonly understood is a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled." See also *Aldridge v. Franco-Wyoming Oil Co.,* 24 *Del. Ch.* 126, 7 *A.* 2d 753, affirmed 24 *Del. Ch.* 349, 14 *A.* 2d 380.

Does the present Agreement fall within the limitations of the quoted definition? I think not. The stockholders under the present Agreement vote their own stock at all times which is the antithesis of a voting trust because the latter has for its chief characteristic the severance of the voting rights from the other attributes of ownership. See *In re Chilson,* 19 *Del. Ch.* 398, 168 *A.* 82. In the cases where the parties to the present Agreement cannot reach an accord as to how they will vote, and are directed by the arbitrator as to how they shall vote their shares the substance of the matter may be said not to differ in effect from a voting trust situation. However, considering the whole Agreement, there is this substantial distinction. Voting trustees have continuous voting control for the period of time stipulated in the agreement of trust. While here, the right of the arbitrator to direct the vote is limited to those particular cases where a stockholder's vote is called for and the parties cannot agree. True, the arbitration provision gives teeth to the Agreement but the parties desired that they should have the initial choice to determine policy in so far as it was determined by the vote of their shares and that a third party identified as an arbitrator should only resolve a conflict. In a voting trust as generally understood, the trustees in the very first instance determine policy and implement it by their votes.

This Agreement is actually a variation of the well-known stock pooling agreement and as such is to be distinguished from a voting trust. As is stated in 5 *Fletcher Cyc. Corp., (Perm.Ed.)* § 2064, *at page* 199, "Such agreements are distinct from voting trusts, and are not controlled by the same principles." See also *Creed v. Copps,* 103 *Vt.* 164, 152 *A.* 369, 71 *A.L.R. p.* 1289. It is my conclusion that the present Agreement is not a voting trust within the meaning of that term as used in *Section* 18 of our *General Corporation Law* and as a consequence, is not invalid for failure to comply with the provisions thereof.

Does the provision for arbitration constitute such a severance of voting control from ownership as to violate some public policy of this state with respect thereto?

The law with respect to agreements of the general type with which we are here concerned is fairly stated as follows in 5 *Fletcher Cyc. Corp., (Perm.Ed.)* § 2064, *at page* 194:

"Generally, agreements and combinations to vote stock or control corporate action and policy are valid, if they seek without fraud to accomplish only what the parties might do as stockholders and do not attempt it by illegal proxies, trusts, or other means in contravention of statutes or law."

The principle of law stated seems to be sound and I think it is applicable here with respect to the legality of the Agreement under consideration. In the first place, there is no constitutional or statutory objection to the Agreement and defendants do not seriously challenge the legality of its objects. Indeed, in my opinion the objects and purposes of the Agreement as they are recited in the Agreement are lawful in principle and no evidence was introduced which tended to show that they were unlawful in operation.

The only serious question presented under this point arises from the defendants' contention that the arbitration provision has the effect of providing for an irrevocable separation of voting power from stock ownership and that such a provision is contrary to the public policy of this state.

Perhaps in no field of the law are the precedents more varied and irreconcilable than those dealing with this phase of the case.

By adhering to strict literalism, it can be said that the present Agreement does not separate voting rights from ownership because the arbitrator only directs the parties as to how they shall vote in case of disagreement. However, recognizing substance rather than form, it is apparent that the arbitrator has voting control of the shares in the instances when he directs the parties as to how they shall vote since, if the Agreement is to be binding, they are also bound by his direction. When so considered, it is perhaps at variance with many, but not all of the precedents in other jurisdictions dealing with agreements of this general nature. See *Alderman v. Alderman,* 178 *S.C.* 9, 181, *S.E.* 897, 105 *A.L.R.* 123; *Creed v. Copps,* 103 *Vt.* 164, 152 *A.* 369, 71 *A.L.R.* 1289.

To the extent that the precedents elsewhere are based on questions other than public policy, they are inapplicable here. As to those cases which strike down agreements containing provisions which have the effect of severing voting control from ownership because of some judicially constructed public policy, I am not satisfied that the invocation of such a sanction is justified. See *White v. Snell,* 35 *Utah* 434, 100 *P.* 927; 5 *Fletcher Cyc. Corp.,* (*Perm.Ed.*) § 2065, at *page* 212 *et seq.* As the California court said in *Smith, et al. v. San Francisco & N. P. Ry. Co., et al.,* 115 *Cal.* 584, 47 *P.* 582, 587, 588, 35 *L.R.A.* 309, 56 *Am.St.Rep.* 119:

"* * * 'Public policy' is a term of vague and uncertain meaning, which it pertains to the lawmaking power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law."

No controlling Delaware precedent has been cited. The case of *Aldridge v. Franco-Wyoming Oil Co., supra,* relied

upon by defendants, dealt only with the question of whether or not the particular Agreement before the court was or was not a voting trust agreement. The court was not called upon, as I am here, to determine whether or not the public policy of Delaware invalidates an agreement of the general type here involved (not being a voting trust), without regard to statutory law. *In re Chilson, supra,* actually turned on the question of the existence of an irrevocable proxy in the absence of a property interest in the holder. In view of the sweeping assumptions made in the case, it is not clear that it can be considered as having to do with anything more than a simple proxy situation—a very different situation from the contractual arrangement here involved.

Directing attention to the present Agreement, what vice exists in having an arbitrator agreed upon by the parties decide how their stock shall be voted in the event they are unable to agree? The parties obviously decided to contract with respect to this very situation and to appoint as arbitrator one in whom both had confidence. The cases which strike down agreements on the ground that some public policy prohibits the severance of ownership and voting control argue that there is something very wrong about a person "who has no beneficial interest or title in or to the stock" directing how it shall be voted. Such a person, according to these cases, has "no interest in the general prosperity of the corporation" and moreover, the stockholder himself has a duty to vote. See *Bostwick, et al., v. Chapman, et al., (Shepaug Voting Trust Cases),* 60 *Conn.* 553, 24 *A.* 32. Such reasons ignore the realities because obviously the person designated to determine how the shares shall be voted has the confidence of such shareholders. Quite naturally they would not want to place such power over their investment in the hands of one whom they felt would not be concerned with the welfare of the corporation. The objection based on the so-called duty of the stockholders to vote, presumably in person, is ludicrous when considered in the light of present day corporate practice. Thus, precedents from

other jurisdictions which are based on reasons which have, in my opinion, lost their substance under present day conditions cannot be accorded favorable recognition. No public policy of this state requires a different conclusion.

Once it be concluded that no constitutional or statutory objection to the validity of the present Agreement exists, as I have found, then I think the objection to its legality must be based not on some abstract public policy but on fraud or illegality of purpose. Since no such fraud or illegality has been shown, defendants' objections must fall.

Defendants say that even if the Agreement is valid under the statutes and public policy of this state, it is, nevertheless, to be governed by "principles applicable to proxy delegations and, hence, would be revocable." Defendants go on to show how, in their opinion, the alleged proxy was revoked and conclude therefrom that the Agreement was not violated. It is perfectly obvious that the construction of the Agreement contended for by defendants, if accepted, would in effect render it meaningless. The answer to this contention of the defendants must be that we are not here concerned with a proxy situation as between the parties to the Agreement on one hand, and the arbitrator Loos on the other. The Agreement does not contemplate such a proxy either in form or in substance.

Defendants make several contentions based on the theory that we are here dealing with an Agreement containing an arbitration provision and that such a provision will not be specifically enforced in this state. Although Loos is referred to in the Agreement as an arbitrator, it is evident that this Agreement does not possess the characteristics which go to make up an arbitration Agreement. Here the action by the arbitrator, so-called, constitutes one of the principal, if not the principal feature of the Agreement. Obviously no Agreement was needed as to the action to be taken by the parties so long as they agreed. Under this Agreement, the arbitrator is *not* given both sides of a con-

flict and required to resolve the issue. The *fact* of the conflict gives to him the power to direct how the stock shall be voted without necessarily being bound by the facts which controlled the decisions of the parties, although both operate pursuant to the same general standard. Moreover, the so-called arbitrator is not called upon to resolve a conflict which would otherwise be decided by a court. The parties agreed to a specific procedure and made it an integral part of the contract itself—not something over and above the contract —which is the only way they could secure the objective they obviously sought in making the Agreement, namely, that the stock would be voted jointly. The principles of law governing arbitration agreements as set forth in *Electrical Research Products, Inc. v. Vitaphone Corp.*, 20 *Del.Ch.* 417, 171 *A.* 738, are, therefore, inapplicable. Nomenclature when inconsistent with the objects and purposes of an agreement should not be permitted to control. Consequently, I have not felt bound by the use of the words "arbitration" and "arbitrator" in the Agreement.

Other contentions made with respect to the invalidity of the Agreement based on the premise that it constituted an arbitration agreement must fall in the light of my conclusion that it was not such an arbitration agreement as is governed by the principles of law relied upon by defendants. Moreover, I cannot agree with the defendants that the validity of this Agreement must in some way be adversely affected by the fact that it provides for a possible further agreement by way of a voting trust. Compare *Wygod v. Makewell Hats, Inc., et al.*, 265 *App.Div.* 286, 38 *N.Y.S.2d* 587.

I conclude that the stock held under the Agreement should have been voted pursuant to the direction of the arbitrator Loos to the parties or their representatives. When a party or her representative refuses to comply with the direction of the arbitrator, while he is properly acting under its provisions (as did Aubrey B. Haley's proxy here), then

I believe the Agreement constitutes the willing party to the Agreement an implied agent possessing the irrevocable proxy of the recalcitrant party for the purpose of casting the particular vote. Here an implied agency based on an irrevocable proxy is fully justified to implement the Agreement without doing violence to its terms. Moreover, the provisions of the Agreement make it clear that the proxy may be treated as one coupled with an interest so as to render it irrevocable under the circumstances. *In re Chilson, supra.* A situation very similar in principle is presented and disposed of in this manner by the California court in *Smith v. San Francisco & N. P. Ry. Co., et al., supra,* 115 *Cal.* at *page* 587, 47 *P.* 582, 35 *L.R.A.* 309, 56 *Am.St.Rep.* 119. Despite certain criticisms of this case, I think it is sound, at least, to the extent relied upon here.

It is the opinion of the court that the nature of the Agreement does not preclude the granting of specific performance, e. g., see *Clark v. Dodge,* 269 *N.Y.* 410, 199 *N.E.* 641. Indeed, the granting of such relief here is well within the spirit of certain principles laid down by our courts in cases granting specific performance of contracts to sell stock which would give the vendee voting control. See *G. W. Baker Mach. Co. v. United States Fire Apparatus Co.,* 11 *Del.Ch.* 386, 97 *A.* 613; *Francis, et al., v. Medill,* 16 *Del.Ch.* 129, 141 *A.* 697. Obviously, to deny specific performance here would be tantamount to declaring the Agreement invalid. Since petitioner's rights in this respect were properly preserved at the stockholders' meeting, the meeting was a nullity to the extent that it failed to give effect to the provisions of the Agreement here involved. However, I believe it preferable to hold a new election rather than attempt to reconstruct the contested meeting. In this way the parties will be acting with explicit knowledge of their rights.

A meeting of the stockholders should be held before a master to be appointed by this court pursuant to the provisions of *Section* 31 of the *General Corporation Law, Rev.*

*Code* 1935, § 2063. It is conceivable that prior to such meeting the parties to the Agreement will be able to agree as to how they will vote their stock, since such a possibility was lost prior to the meeting here reviewed through certain unfortunate happenings having nothing to do with the merits of the policy disagreement. It is obviously to the advantage of both parties to avoid the necessity for calling upon the arbitrator to act, and he will only act if the parties are unable to agree and action by him is requested. It must and should be assumed that the so-called arbitrator, if called upon to act, will bring to bear that sense of duty and impartiality which doubtless motivated the parties in selecting him for such an important role. In any event, the master in conducting the election will be bound to recognize and to give effect to the Agreement here involved, if its terms are properly invoked.

A decree accordingly will be advised.

Note: Decree modified on appeal. See *post p.* 610, 53 *A.* 2d 441.