ROSE MARY WADMAN, Trustee under the Will of Alton J. Wadman et al. *v.* THOMAS R. McBIRNEY et al.

[No. 978, September Term, 1981.]

*Decided April 8, 1982.*

The cause was argued before GILBERT, C. J., and MORTON and BISHOP, JJ.

*John M. Bray,* with whom were *Laura A. Kumin* and *Schwalb, Donnenfeld, Bray & Silbert, David A. Sacks* and *Sacks & Kohn* on the brief, for appellants.

*James J. Cromwell,* with whom were *David L. Terzian* and *Spriggs, Cromwell, Myers, Nicholson & Spire, P.A.* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

## THE ISSUE

Ordinarily "proxy fights" are thought of as occurring in large corporations when one individual or group endeavors to oust incumbent management and, thus, to take over and control the corporate direction. The instant appeal is a battle over the validity of a proxy and is illustrative of the fact that such corporate combat is not limited to conglomerates but also occurs in small corporations.

The specific question put to us is whether a ten-year "irrevocable proxy" given to one stockholder by another constitutes a "sale" of that stock within the meaning of a covenant restricting transferability of stock. The underlying issue is whether the appellants will emerge in control of the operation of the corporation or whether Lawrence B. Marsh, one of the appellees, will continue to run the company.

## THE FACTS

Our review of the record discloses that Thomas R. McBirney, Lawrence B. Marsh, and Alton Wadman were the

stockholders in a corporation known as "Marsh-McBirney, Inc." The entity was formed in 1971. Initially each of the three stockholders owned 5,000 shares of Class A common stock and 818 shares of Class B, non-voting common stock.

The charter provided for 99,900 shares of common stock, 19,900 shares of which were Class A. Only 15,000 shares of Class A stock were issued.

The charter contains the following alienation of transferability article: [1]

"*SEVENTH:*

(a) No stockholder shall sell, assign, convey, transfer or dispose of the Class A capital stock of this Corporation, either to another stockholder of the Corporation or an outsider, unless and until he shall have first offered the said share or shares of Class A stock in writing to the board of directors for the benefit of the remaining Class A stockholders of the Corporation.

(b) Said remaining Class A stockholders, within thirty days from the notice in writing to the board of directors of intention by the selling Class A stockholder, shall have the right to purchase the said share or shares of stock at the same price at which the selling Class A stockholder has obtained a *bona fide* offer to purchase.

(c) A Class A stockholder shall initially have the right to purchase shares offered for sale in the same proportion that the number of Class A shares already owned by him bears to the total Class A stock issued; provided, that a Class A stockholder shall have the right to purchase a greater proportion than aforesaid, at such time as another Class A stockholder has failed or refused to purchase his proportionate part of the shares offered for sale.

---

1. We are unable to state whether the restriction on transferability appears on the stock certificate itself inasmuch as there is no indication in the record one way or the other. *But see* Md. Corp. & Ass'ns (1975) Code Ann. § 2-211 (d).

(d) No transfer, other than by death, of the Class A shares of the Corporation shall be valid or binding on the Corporation unless the foregoing requirements have been met."

At some point in time, Marsh sold 534 shares of his Class A common stock to Irving Hill.[2] We infer that particular transaction complied with Article Seven of the corporate charter.

Wadman died and his shares became the property of a testamentary trust with Rose Mary Wadman as Trustee. Mrs. Wadman was elected a director of the corporation.

Apparently some discord arose because of the fact that Marsh and McBirney were salaried employees of the company, and received certain "perks," such as the use of motor vehicles leased by the corporation. In addition, Marsh and McBirney were awarded periodical bonuses. Mrs. Wadman, even though a director, received no income from the corporation. Dividends have never been paid to the stockholders, and while the company has shown a profit, salary increases and bonuses for Marsh and McBirney have apparently precluded the declaring of dividends.

Suggestions by Wadman and Hill pertaining to the operation of the business were generally rejected by the majority vote of the Board of Directors.

Marsh became disenchanted with his remuneration in light of the fact that he considered himself to be the major contributor to the corporate well-being. He expressed his dissatisfaction to McBirney and talked of leaving the company. McBirney said that he feared that if Marsh left, the company would fail, so McBirney decided to seek other employment, thus leaving Marsh with the Company. Under date of February 15, 1980, McBirney notified stockholders in writing of his intent to sell 3,500 shares of his Class A common stock at and for the sum of $28 per share.[3] The stock

2. Throughout the record, Mr. Hill is referred to as "Judge Hill." We were told on oral argument that Hill is a member of the Federal Bench in Los Angeles, California.

3. Originally, the stock was purchased for $1.00 per share.

was purchased by each Class A stockholder in the manner prescribed by the corporate charter. After the sale by McBirney, the Class A common stock was owned as follows:

| | | |
|---|---|---|
| Hill | 721 | shares |
| McBirney | 1,500 | " |
| Marsh | 6,029 | " |
| Mrs. Wadman as Trustee | 6,750 | " |
| Total | 15,000 | " |

Contemporaneously with the notice to sell the 3,500 shares of Class A common stock, McBirney sold his entire 818 shares of Class B non-voting common stock to Marsh for $2.50 per share or a total of $2,045.[4] McBirney agreed with Marsh that he, McBirney, would execute a ten-year "Irrevocable Proxy" of McBirney's remaining 1,500 shares of Class A common stock. There is no provision in the charter against proxies. The proxy, which was signed on March 19, 1980, provided, *inter alia:*

"KNOW ALL MEN BY THESE PRESENTS, that I, the undersigned a stockholder of MARSH-McBIRNEY, INC. a corporation organized and existing under the laws of the State of Maryland (hereinafter sometimes call [*sic*] the "Corporation"), do hereby irrevocably make, constitute and appoint Lawrence B. Marsh, 12842 Littleton Street, Silver Spring, Maryland 20906, with full power of substitution, my true and lawful attorney and proxy, for and in my name, place and stead, for a period of ten (10) years from the date hereof to vote upon the fifteen hundred (1,500) shares of "Class A Voting Common Stock" owned by me or standing in my name on the books of the Corporation as my proxy, at any and all meetings of the stockholders of MARSH-McBIRNEY, INC. held within the aforesaid period, upon any and all

---

4. The Class B common stock was not subject to restriction on transferability.

matters of any kind of nature whatsoever which may be presented, considered, and voted upon at any annual or special meeting of stockholders, or any adjournments thereof, of the said Corporation, including the signing of my name as such stockholder to any waiver or consent certificate which the laws of the State of Maryland may require or permit, as fully and with like effect as I might or could have done if personally present, hereby ratifying and confirming all that my said attorney and proxy may do in my name, place and stead. The instrument shall not be deemed to be a general power of attorney and does not authorize any action which would require the undersigned to be personally responsible for any debt or obligation of the Corporation."

The proxy which was made binding on the McBirney's heirs and personal representative was conditioned in part on Marsh's remaining as President of Marsh-McBirney, Inc.[5]

Wadman and Hill filed a polychotomous bill for declaratory judgment in the Circuit Court for Montgomery County in which they alleged that McBirney and Marsh had, under the circumstances, effected a sale in violation of Article VII

---

5. The proxy also provided in part, not here relevant, that:

"In the event that the aforesaid Lawrence B. Marsh or any entity or person controlled by Lawrence B. Marsh, directly or indirectly, shall at any one time in the future own of record more than fifty-one (51%) per cent of the issued and outstanding shares of the "Class A Voting Common Stock" of the Corporation (or any other shares of capital stock issued with respect thereto, whether by distribution, recapitalization, or merger), AND, THEREAFTER, if the following two (2) events occur simultaneously, namely, (1) that Lawrence B. Marsh shall not be employed by the Corporation, AND (2) that Lawrence B. Marsh, or any entity or person controlled by Lawrence B. Marsh, directly or indirectly, shall own of record less than twenty (20%) per cent of the issued and outstanding shares of the "Class A Voting Common Stock" of the Corporation (or any other shares of the capital stock issued with respect thereto, whether by distribution, recapitalization or merger), then, in the event that all three (3) of the aforesaid events shall have taken place, the instant Irrevocable Proxy may be revoked at the option of Thomas R. McBirney provided he gives written notice thereof to Lawrence B. Marsh." (emphasis supplied)

of the charter; that the "sale" violated the "rights" of the plaintiff-appellant "to purchase their respective proportionate shares" of the 1,500 shares of stock over which Marsh was granted McBirney's proxy. Additionally, the declaration alleged that McBirney and Marsh "breached the contract" created by Article VII of the corporate charter; that Marsh "intentionally and with actual malice" induced McBirney to "breach his contractual obligation" under Article VII so that Marsh would "obtain control" of the corporation; that McBirney and Marsh conspired to give Marsh control of the corporation and, thus, "defraud" Wadman and Hill; and that McBirney and Marsh were guilty of "fraudulent conduct."

Wadman and Hill asked that the proxy be declared null and void, that they be entitled to "their proportionate shares" of the McBirney's retained 1,500 shares, and that the plaintiffs-appellants be awarded compensatory and punitive damages totaling $4,250,000 together with attorney's fees.

McBirney and Marsh answered the count pertaining to the validity of the irrevocable proxy and demurred to each of the other four counts. At the same time, the defendant-appellees moved for summary judgment as to the validity of the irrevocable proxy. Wadman and Hill then filed for summary judgment as to the same count.

Judge Stanley B. Frosh denied Wadman's and Hill's motion for summary judgment, granted that of McBirney and Marsh, caused judgment to be entered thereon, and sustained the demurrer as to the remaining counts, with leave to amend. Wadman and Hill elected to stand on their declaration as pleaded and appealed all rulings to this Court.

If we hold the proxy to be valid, the other counts of the declaration will fall of their own weight. Persons do not "conspire" to do a legal act by lawful means; if the proxy is valid, it does not constitute a "sale" in violation of appellants' "rights."

Admittedly, McBirney did not want to see Wadman and Hill in control of the corporation because he feared that Marsh would leave the company, thereby causing its demise.

From the record before us, we glean that Marsh was the major contributor to the corporation growth. We, however, do not intimate, since we have no knowledge, whether Marsh's departure from the company would materially affect its operation and vitality.

## I.

Appellants have cited us to a number of cases, but they are all concerned with restrictions on the transfer of stock or the meaning of "sale" within the scope of the Securities Exchange Act. None are apposite to the instant case. Indeed, we have not been directed, by either party, to any case directly on point, and we have found none.[6]

Maryland Corp. & Assn's Code Ann. § 2-506 permits shareholder voting by proxy unless otherwise proscribed by the corporate charter. Needless to say, the charter of McBirney-Marsh, Inc. did not prohibit proxy voting else there would be no case before us.

Section 2-507 of the Corp. and Assn. Art. provides:

"(a) *Each share entitled to one vote.* — Unless the charter provides for a greater or lesser number of votes per share or limits or denies voting rights, each outstanding share of stock, regardless of class, is entitled to one vote on each matter submitted to a vote at a meeting of stockholders. However, a share is not entitled to be voted if any installment payable on it is overdue and unpaid.

(b) *Manner of voting; proxies.* — (1) a stockholder may vote the stock he owns of record either:

(i) in person; or

---

6. There are, of course, many cases regarding the irrevocability *vel non* of proxies under the common law. There are also a few cases concerning the life span of a proxy decided on the basis of a state statute markedly dissimilar to that of Maryland. None of these cases is of guidance to us in the instant matter.

(ii) By written proxy signed by the stockholder or by his duly authorized attorney in fact.

(2) Unless a proxy provides otherwise, it is not valid more than 11 months after its date.

(3) Unless otherwise agreed in writing, the holder of record of stock which actually belongs to another shall issue a proxy to vote the stock to the actual owner on his demand."

The section does not proscribe "irrevocable" proxies, nor does it limit the life of the proxy if the proxy, itself, provides for a life span of "more than 11 months." Thus, insofar as section 2-507 is concerned, a proxy may be endless if the proxy, itself, so states.

Even if the "irrevocable" proxy in the matter *sub judice* satisfies the statute, is it, nevertheless, void as against public policy? [7] While we find that rhetorical question academically inviting, we shall not pursue the inquiry because we believe the proxy involved in the instant case to be other than "irrevocable."

The adjective "irrevocable" is defined as "Incapable of being retracted or revoked; irreversible." [8] A reading of the proxy, quoted above, that is the case of the matter now before us, reveals that the proxy terminates upon:

1. the expiration of ten years from March 19, 1980;

---

**7.** The general view is that a proxy is not irrevocable unless it is coupled with an interest. *See* 5 Fletcher, *Cyclopedia of the Law of Private Corporations,* (1976 ed.) § 2062.

**8.** *The American Heritage Dictionary of the English Language* (1970) p. 693. To the same effect *see:*

1. Incapable of being recalled or revoked: past recall. *Webster's Third New International Dictionary, Unabridged* 1976 ed.

2. Incapable of being revoked or repealed; unalterable. *Funk & Wagnalls New Practical Standard Dictionary,* Britannica World Language Edition, 1955.

3. That cannot be called, brought, fetched or taken back; that is beyond recall or recovery. That cannot be revoked, repealed, annulled or undone; unalterable, irreversible. Oxford, *English Dictionary on Historical Principles,* 1901.

4. That which cannot be revoked or recalled. *Black's Law Dictionary.* 5th ed. 1979.

2. the occurrence of the following events:

   a. Marsh, during the life of the proxy acquires 51% of the Class A voting stock of McBirney-Marsh, Inc.

   b. Marsh's employment with McBirney-Marsh, Inc., is ended voluntarily or otherwise.

   c. Marsh shall at any time during the life span of the proxy own or control less than 20% of the Class A voting common stock of the corporation.

3. Marsh's return of the proxy to McBirney.

4. Marsh's death before the expiration of the proxy's life time.

Simply because the parties to the proxy style it as "Irrevocable" does not mean that others will see it similarly. Camouflage may change the appearance of something, but not its composition.

We think the proxy in the instant case is not irrevocable, nor violative of the statute.[9]

There then remains a question of whether the "Irrevocable" proxy is, in the instant case, a sale, conveyance, transfer, or disposition of McBirney's interest in the 1,500 shares of Class A voting common stock.

A "proxy," in the final analysis, is similar to a power of attorney. It is a written device used by one person to deputize another person to act in the proxy giver's place or stead, but unlike a power of attorney, it is usually confined to some corporate act, matter, or deed. As such it grants a privilege or license to the holder of the proxy to vote the shares of the owner of that stock in a manner satisfactory to the proxy holder. A holder of a proxy, however, is not entitled to any

---

**9.** The arrangement also falls well short of qualifying as a voting trust. That corporate tool is "a device whereby two or more persons owning stock with voting powers, divorce the voting rights thereof from the ownership, retaining to all intents and purposes the latter in themselves and transferring the former to trustees in whom the voting rights of all the depositors in the trust are pooled." Ringling v. Ringling Bros.-Barnum & Bailey Combined Shows, 29 Del. Ch. 318, 49 A.2d 603, 608 (1946), *modified,* 29 Del. Ch. 610, 53 A.2d 441 (1947).

dividends that may be declared upon the stock for which he holds a proxy, nor to any distribution in liquidation. Moreover, the holder of the proxy has no right to execute the option with respect to that stock afforded in Art. VII of the corporation charter.

The restrictions in the McBirney-Marsh corporate charter on the right to "sell, assign, convey, transfer or dispose" of Class A common stock involve incidents of ownership that are concerned with title to the stock. All that is proscribed by that restrictive language is any transfer of title by way of sale, assignment, conveyance, or other disposition of the title. The restrictive covenant does not prohibit proxies which are the only incident of ownership that can be delegated without transferring title.

Since, in the instant case, there was no transfer of title, in any form, there was no violation of the restrictive covenant.

II

Count II is predicated on a premise that the proxy given by McBirney to Marsh was in violation of the corporate restrictions. Since that is not the situation, Count II must fall.

Count III asserts that Marsh induced McBirney "to breach his contractual obligations" to the appellant. The allegation assumes that the giving of a proxy constitutes a breach of the restrictions contained in Article Seven. Inasmuch as we have determined that a proxy such as here, does not breach the covenant against sale, transfer, and the like, that Count must also fall.

Count IV asserts that McBirney and Marsh entered into a conspiracy, a dolose, the heart of which was to preclude Wadman and Hill from acquiring a proportionate share of McBirney's 1,500 shares. Appellants, of course, had no interest in the shares, nor will they acquire any rights to the shares until and unless McBirney decides to transfer

ownership of the stock, something McBirney has not indicated a desire to do.

The final count of the declaration, Count V asseverates an alleged "shift [of] ownership and voting control of a majority" of voting stock of the company. The issuance of the proxy by McBirney to Marsh is not illegal. Count V is as defective as Counts II, III, and IV.

We hold that Judge Frosh did not err in sustaining the appellee's demurrer to the Wadman and Hill declaration.

## III

The appellants next argue that they should have been allowed access to the records and files of the attorneys for McBirney and Marsh. Appellants, seemingly likening themselves to some sort of grand jury probe, have decided they should be entitled to invade the files and records of the appellees' lawyers so as to examine those records and files for possible fraud against the appellants.

Prior to the giving of the proxy in the case now before us, Marsh and McBirney each sought and obtained separate counsel for advice as to the best way to handle the 1,500 shares of McBirney. Neither counsel represented the appellees in the trial court or here.

Apparently perceiving a form of conspiracy between the appellees as well as their attorneys, the appellants employ a sort of civil unindicted conspirator charge and assert that they are thus entitled to examine counsel's files and records. We disagree. While there is justification for the erosion of the client-attorney privilege when the attorney is an alleged conspirator or codefendant in a criminal cause, we flatly refuse to extend that concept to civil litigation. Inquisitional explorations, in civil cases, into the files pertaining to the attorney's clients should not be permitted lest privilege, the basic ingredient of the attorney-client relationship, be destroyed.

Once the profession is affected by the loss of the privileged

communication, the practice of law, as it now exists, is doomed just as if it were infected by an incurable metastasized cancer.

## IV

Finally, appellants argue that the costs of certain depositions should not have been assessed as part of the court costs.

Md. Rule 415 b provides:

"It shall be discretionary with the court to tax as part of the costs of the case all or any part of the cost of any other deposition taken by any party to the action."

Although no trial was actually held because of the court's preliminary rulings, the judge was acting within the bounds of his discretion in assessing the costs of the extensive deposition taken by appellants of the appellees.

The appellants simply allege that Judge Frosh abused his discretion. We do not see it that way. The costs of the deposition might well have been considered by the judge to be unnecessary expenditures of monies and, therefore, properly assessable against the party generating that cost. We observe no abuse of discretion.

*Judgment as to count I affirmed.*

*Order sustaining demurrer to counts II, III, IV and V affirmed.*

*Assessment of costs of deposition against appellants affirmed.*

*Costs to be paid by appellants.*