823 A.2d 590

**Deborah PORTERFIELD**

v.

**MASCARI II, INC.**

**No. 14, Sept. Term, 2002.**

Court of Appeals of Maryland.

May 8, 2003.

404

Judith S. Stainbrook, Westminster, for petitioner.

Marc S. Levine (Handler & Levine, LLC, Bethesda, Diane A. Seltzer, Washington, DC, on brief), for respondent.

Deborah Thompson Eisenberg, Public Justice Center, Stephen H. Sachs, of counsel, (Brief of Public Justice Center, CASA of Maryland, D.C. Employment Justice Center, Legal Aid Bureau, Maryland Disability Law Center), Baltimore, Amicus Curiae.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, J.

Deborah Porterfield ("Petitioner") alleges that she was discharged wrongfully by her employer, Home Instead Senior Care ("Home Instead"), for implying an intent to seek legal advice before responding to an unfavorable work evaluation. Porterfield was employed as an administrative assistant by Home Instead from December 1997 through August 1999. After receiving a written "Employee Warning," she informed her supervisors at Home Instead that she had been advised to consult an attorney before "formally responding" to the warning.[1] Porterfield's employment was terminated almost immediately. As a result, she filed a complaint against Respondents[2] in the Circuit Court for Montgomery County alleging among her causes of action one for wrongful discharge. Re-

---

**1.** At the time Porterfield told her employer of her "intent" to seek legal advice, the only request by the employer then pending was that Porterfield sign an acknowledgment of the warning.

**2.** Porterfield named as defendants: (1) Mascari, Inc.; (2) Mascari II, Inc.; (3) Patricia Mascari; and, (4) Julie Elseroad. Julie Elseroad, Porterfield's immediate supervisor at the time of her firing, is not a party to the present proceeding because Porterfield is only pursuing the wrongful discharge claim here and Ms. Elseroad was not named as a defendant in that count. Porterfield asserted five counts in her amended complaint: (1) wrongful discharge perpetrated by Mascari Inc. and Patricia Mascari; (2) defamation perpetrated by all of the defendants concerning Porterfield's general ability and fitness for her chosen employment; (3) tortious interference perpetrated by Julie Elseroad by means of knowingly and maliciously making false statements concerning Porterfield to Patricia Mascari; (4) tortious interference with Porterfield's economic interests by all defendants; and, (5) defamation by all defendants occurring at an appeals hearing on Porterfield's claim for unemployment benefits.

spondents filed a Motion to Dismiss which was granted by the Circuit Court. Porterfield appealed the judgment to the Court of Special Appeals which affirmed. We granted certiorari on Porterfield's petition to resolve the following rephrased question:[3] Is it a violation of public policy sufficient to support a wrongful discharge action in Maryland when an employer fires an at-will employee for stating her intent to seek advice from legal counsel before responding to an adverse employment evaluation? 369 Md. 179, 798 A.2d 551 (2002). We shall affirm the judgment of the Court of Special Appeals.

## I.

On 1 December 1997, Thomas Mascari, the original franchisee of the Home Instead[4] franchise based in Rockville, Maryland, hired Deborah Porterfield ("Petitioner") to work full time as Staff Coordinator. Her duties primarily consisted of assisting him with administrative matters.[5] Thomas Mascari became seriously ill and died on 29 January 1999, leaving Home Instead to his sister, Patricia Mascari ("Mascari"), to manage.

Julie Elseroad ("Elseroad") was hired in March of 1999 to perform clerical and administrative duties in the office. In response to ensuing conflicts between Porterfield and Elseroad, Mascari performed a formal review of Porterfield's work to assure her that her employment was secure. Porterfield

---

**3.** Petitioner framed the question in her petition for writ of certiorari and her brief essentially as follows: "Does Petitioner's discharge from employment contravene the public policy of Maryland mandating that people have a right to consult an attorney of their choice concerning matters of importance?" Upon our review of the record, the more specific question posed in this case is as we have rephrased it.

**4.** Home Instead provided non-medical care in the homes of care recipients by means of referring the actual providers of care to those recipients. Home Instead screened the care-givers and administered the provision of care in exchange for a fee paid by the recipients of the care.

**5.** These administrative matters included marketing, staffing, and setting up the principal office of Home Instead.

received all "above average" ratings and Mascari additionally commented that Porterfield was a "tremendous asset" to Home Instead.

On or about 5 May 1999 Mascari requested that Porterfield work three-day work weeks until Home Instead's revenues increased. Shortly thereafter, Mascari informed Porterfield that she had been told that Porterfield had complained about her employment at Home Instead–Rockville to another Home Instead franchisee. Porterfield denied making any such remark and told Mascari she was happy with her employment situation.

In June of 1999, Mascari issued a new recruiting policy for potential care-givers.[6] On at least two occasions after the edict was issued, Porterfield was reprimanded by Mascari for failing to conform to the new recruiting policy. On Monday, 30 August 1999, Mascari issued Porterfield a written "Employee Warning Report" alerting Porterfield that she would be discharged if Mascari and Elseroad did not see "marked improvement at the end of the next four weeks." The report contained numerous statements which Porterfield claimed were false. Among these were statements that in a meeting on 4 August 1999 with Mascari and Elseroad, Porterfield had "refused [their] assistance," and had "initially quit;" that at the meeting Mascari and Elseroad had spoken to Porterfield about her "not being efficient or productive in most aspects of [her] job;" that Porterfield was "not adhering to her workplan;" and that Porterfield had received a "[p]revious [w]arning" on 23 June 1999. Mascari requested that Porterfield sign the warning report,[7] but Porterfield stated that she wanted to take the document home and review it.

---

6. In furtherance of this policy, Mascari instructed Porterfield to stop recruiting, accepting applications from, and interviewing residents of Prince George's County as potential care-givers. The validity *vel non* of this policy was not alleged to be related to the gravamen of Porterfield's discharge.

7. The employee acknowledgment section at the end of the warning report stated "I have read this 'warning decision' and understand it."

On the following day, Tuesday, 31 August, a scheduled day-off for Porterfield, she allegedly phoned Elseroad and stated, "[d]ue to the seriousness of the libel contained in the document, I have been advised to seek counsel before formally responding." She expressed her hope to complete a response by that Friday, 3 September, but allowed as how it might take until Monday, 6 September, to complete a response. Later on 31 August, Mascari phoned Porterfield and told her that she was fired.[8]

Porterfield filed her complaint against Mascari Inc.,[9] Mascari II, Inc., Patricia Mascari, and Julie Elseroad on 30 August 2000 in the Circuit Court for Montgomery County alleging five counts, including a wrongful discharge count against Patricia Mascari and the corporations only. She filed an Amended Complaint on 30 October 2000.[10]

With respect to the wrongful discharge count against Home Instead and Mascari, Porterfield alleged that her discharge violated the abusive discharge doctrine announced by this Court in *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), *ans. conformed to*, 538 F.Supp. 572 (D.Md.1982), *aff'd in part & rev'd in part*, 830 F.2d 1303 (4th Cir.1987), because Respondents "discharg[ed her] because of [her] articulated desire to consult counsel before submitting to [Respondents] her response to the Employee Warning Report." She

---

**8.** Mascari reportedly said: "Julie gave me your message. I think it is time we part company. It will not be necessary [for you] to return to the office."

**9.** Mascari, Inc., and Mascari II, Inc., are Maryland corporations that operate the Rockville franchise known as Home Instead Senior Care ("Homestead").

**10.** As to the wrongful discharge count of the amended complaint, Porterfield adopted and incorporated by reference only the factual allegations of paragraphs 2 through 13 of the amended complaint. As to the other counts, she adopted all of the preceding factual averments, paragraphs 2 through 34. Viewed in context, it was an obvious oversight to have incorporated only paragraphs 2 through 13 in the wrongful discharge count. For purposes of this opinion, we shall consider all of the arguably relevant factual averments of the amended complaint.

alleged that the public policy of Maryland "mandated that all persons be permitted freely to consult with an attorney of their choice concerning matters of importance in their lives, including matters related to their employment." Porterfield contends that Mascari discharged her because she knew the grounds of the warning report were false and feared that Porterfield would retain a lawyer and sue her for defamation, or alternatively, that Mascari did not want to work with an employee who had consulted an attorney regarding a work-related dispute.

The defendants filed a Motion to Dismiss on 6 December 2000 asking the Circuit Court to dismiss all five counts against them because Porterfield failed to state a cause of action upon which relief could be granted. No written opposition to that motion was filed by Porterfield. A motions hearing was held on 7 March 2001. At the conclusion of the hearing, the judge granted the motion to dismiss all counts with prejudice. He found the amended complaint to be "generally deficient overall with respect to each and every count," and characterized its contents as "vague," "general," and "non-specific." [11]

Porterfield appealed the Circuit Court's judgment to the Court of Special Appeals. That court's review was limited to considering whether an employee who alleged that she was terminated from employment for seeking to consult with an attorney before acknowledging a written warning of inadequate job performance stated a cause of action for wrongful discharge. The court held, in a reported opinion, that such allegations, without more, did not state a cause of action.

Porterfield rested her argument in the intermediate appellate court on the contention that her discharge violated "some clear mandate of public policy." Porterfield pointed to *Adler*, 291 Md. at 47, 432 A.2d at 473, for the proposition that "Maryland has long recognized that a cause of action for

---

11. Petitioner's present counsel did not enter her appearance in this matter until the day of oral argument in the trial court on the motion to dismiss. Thus, she had no part in the drafting of the amended complaint.

abusive discharge of an at-will employee may lie 'when the motivation for the discharge contravenes some clear mandate of public policy.' " Porterfield further contended that a plaintiff may bring an action for abusive discharge when the plaintiff is fired in violation of a public policy mandate for which no statutory remedy exists. Essential to her argument was her assertion that there existed in Maryland a strong public policy favoring access to legal counsel and that Respondents' actions violated this policy. Petitioner also placed great emphasis on cases from Iowa and Ohio that recognized "the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine." *Simonelli v. Anderson Concrete Co.*, 99 Ohio App.3d 254, 650 N.E.2d 488 (1994). *See Thompto v. Coborn's Inc.*, 871 F.Supp. 1097 (N.D.Iowa 1994).

Respondents argued to the Court of Special Appeals that Petitioner failed to identify a clear mandate of public policy that had been violated by her discharge. Respondents interpreted *Adler* to stand for the proposition that the public policy exception to the at-will employment doctrine is to be narrowly construed and operates only where the discharge violates a "manifestly clear expression of public policy." They claimed that there is a "strong presumption against the judicial creation of novel and undeclared concepts of public policy that are not squarely grounded in statute, administrative regulations or common law." Furthermore, Respondents relied on *Watson v. Peoples Sec. Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991), to demonstrate that Petitioner's theory of wrongful discharge already had been rejected by this Court.

The Court of Special Appeals opined that, for the tort of wrongful discharge to lie, the public policy in question must be "a preexisting, unambiguous, particularized announcement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation." *Porterfield v. Mascari*, 142 Md.App. 134, 140, 788 A.2d 242, 245 (2002). The complaining party must plead with particularity the source of the public

policy and the alleged violation which a court will then evaluate to determine whether, as a matter of law, the relevant policy considerations constitute a clear mandate. *Id.* Furthermore, the intermediate appellate court noted that the tort of wrongful discharge was designed specifically to address "particularly reprehensible conduct" and provide a remedy for such conduct when no other remedy is available. *Porterfield,* 142 Md.App. at 140–41, 788 A.2d at 245. The court observed that when the public policy at issue is contained in a statute and the statute provides a remedy, a tort action for wrongful discharge is not available. *Id.*

The Court of Special Appeals declined to recognize generalized expressions of right to counsel as a public policy basis for Petitioner's wrongful discharge claim. Finding this case to be similar to *Watson,* the court reiterated our holding in *Watson,* that "absent a statute expressing a clear mandate of public policy, there is ordinarily no violation of public policy when an employer discharges an at-will employee in retaliation for the employee having sued the employer." *Porterfield,* 142 Md. App. at 142, 788 A.2d at 246 (citing *Watson,* 322 Md. at 478, 588 A.2d at 766). Following our reasoning in *Watson,* the intermediate appellate court concluded that

> while there may be a general right to engage in certain activity, even if the activity is favored by public policy, it does not necessarily follow that the right to pursue the activity equates with the right to remain employed and converts a non-actionable termination of employment to an actionable one.

142 Md.App. at 141, 788 A.2d at 245. The court dismissed Petitioner's reliance on the Ohio and Iowa cases stating that "they are not consistent with the law of Maryland." 142 Md.App. at 143, 788 A.2d at 246.

## II.

### A.

 Maryland Rule 2–322(b)(2)(2000) provides that a defendant may, in a civil suit in a circuit court, seek dismissal of

a case through preliminary motion when the complaint fails "to state a claim upon which relief can be granted." A defendant asserts in such a motion that, despite the truth of the allegations, the plaintiff is barred from recovery as a matter of law. *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624, 631 (1995). In ruling on such a motion, the court must assume the truth of all well-pled facts in the complaint as well as the reasonable inferences that may be drawn from those relevant and material facts. *Bd. of Educ. v. Browning,* 333 Md. 281, 286, 635 A.2d 373, 376 (1994). Dismissal is appropriate only if the well-pled facts and reasonable inferences, viewed in the light most favorable to the plaintiff, fail to afford that party the relief requested. *Berman v. Karvounis,* 308 Md. 259, 264–65, 518 A.2d 726, 728 (1987). We must determine on review whether, on its face, the amended complaint in this case pleads a legally sufficient cause of action.

### B.

Petitioner asks this Court to find that the general right to consult counsel is a "clear mandate of public policy," the violation of which is a sufficient basis for a wrongful discharge cause of action.[12] She acknowledges that Maryland has not recognized such a public policy basis for a wrongful discharge action heretofore, but asks us to follow suit with the Ohio and Iowa cases she cites finding that a claim for wrongful discharge based on a violation of public policy will lie when an employee is terminated for consulting an attorney. *See*

---

12. A Brief of Amici Curiae was filed in this matter on behalf of the Public Justice Center, Casa of Maryland, D.C. Employment Justice Center, the Legal Aid Bureau of Maryland, and the Maryland Disability Law Center. We thank them for their participation. The heart of their argument is that there are several statutory bases in Maryland to support finding the right to consult counsel about employment matters as a clear mandate of public policy sufficient to support an exception to the at-will employment doctrine. Their arguments echo those of Petitioner, but with additional emphasis on the Maryland Rules of Professional Conduct as a "statutory" indication of the public policy favoring access to legal counsel.

*Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097 (N.D.Iowa 1994); *Simonelli,* 99 Ohio App.3d 254, 650 N.E.2d 488 (1994). The U.S. District Court in *Thompto* concluded that the articulation of the right to counsel in Iowa, as embodied in the Code of Professional Responsibility for attorneys adopted by the Iowa Supreme Court, fee-shifting provisions in the Iowa Civil Rights Act, and as recognized as essential in criminal cases by the United States Supreme Court, work in tandem to create a public policy

> favoring consultation with attorneys in order to determine whether a person has a legal problem, [a] public policy favoring the availability of competent legal advice, [a] public policy placing on lawyers a duty to counsel only actions that are legal and just, and [a] public policy favoring compensation of legal counsel for individuals who endeavor to vindicate civil rights, the court concludes that acts that impede an individual from seeking legal advice would be "injurious to the public, or against the public good," would not be "right and just," and could potentially have a deleterious effect on "what affects the citizens of the State collectively."

871 F.Supp. at 1121.

The Court of Appeals of Ohio likewise recognized that "the act of firing an employee for consulting an attorney could serve as the basis for a public policy exception to the common-law employment-at-will doctrine." *Simonelli,* 650 N.E.2d at 492. Following *Thompto,* the *Simonelli* court stated that

> clear public policy sufficient to justify an exception to the employment-at-will doctrine is not limited to public policy expressed by the General Assembly in the form of statutory enactments, but may also be discerned as a matter of law based on other sources, such as the Constitutions of Ohio and the United States, administrative rules and regulations, and the common law.

650 N.E.2d at 491.

Petitioner directs our attention to claimed indicia in Maryland that the general right to consult legal counsel is a "clear mandate of public policy." Porterfield, in this Court, draws from constitutional, statutory, and common law sources to

support her argument. According to Petitioner, Article 21 of the Maryland Declaration of Rights[13] mandates access to counsel in criminal cases and Article 24[14] mandates access to counsel in both criminal and civil cases. Petitioner also relies on numerous decisions by this Court to assert that the right to counsel has been recognized as an important public policy in Maryland. *See Zetty v. Piatt*, 365 Md. 141, 776 A.2d 631 (2001) (holding that the right to counsel attaches in civil contempt proceedings involving actual incarceration); *Rutherford v. Rutherford*, 296 Md. 347, 464 A.2d 228 (1983) (stating that the requirements of due process include a right to counsel even in the context of a civil contempt proceeding); *Sites v. State*, 300 Md. 702, 481 A.2d 192 (1984) (recognizing the right of a person stopped for driving while intoxicated to consult with a lawyer before deciding whether to take a chemical sobriety test). The attorney-client privilege is another example Petitioner relies upon to insinuate that the right to counsel is a strong public policy. *See Helferstay v. Creamer*, 58 Md.App. 263, 473 A.2d 47 (1984) (holding that the attorney-client privilege "is based upon the public policy that 'an individual in a free society should be encouraged to consult with his attorney whose function it is to counsel and advise him and he should be free from apprehension of compelled disclosure by his legal advisor' "); *Wadman v. McBirney*, 51 Md.App. 385, 443 A.2d 978 (1982) (stating that "[o]nce the [legal] profession is affected by the loss of the privileged

---

13. Article 21 of the Maryland Declaration of Rights provides,

That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the indictment, or charge, in due time (if required) to prepare for his defense; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

14. Article 24 of the Maryland Declaration of Rights states "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

communication, as it now exists, [it] is doomed just as if it were infected by an incurable metastasized cancer"); *Trupp v. Wolff*, 24 Md.App. 588, 609, 335 A.2d 171, 184 (1975) (holding that "Maryland follows the common law in granting clients a privilege against disclosure of communication with their attorneys," and stating that without the privilege, "the constitutional guarantee of counsel would be empty and meaningless"). Another example Petitioner references is the Maryland Legal Services Corporation Act, codified at Maryland Code (1957, 2001 Repl. Vol), Article 10, § 45A–O, which effectuates the general goal of enhancing the availability of legal counsel to all persons in civil proceedings.[15] Petitioner combines these various sources and concludes that they form a public policy sufficient to mandate barring the discharge of an employee for exercising her right to consult counsel under the facts as alleged. Such an employee, Petitioner argues, is entitled to bring a wrongful discharge claim in order to vindicate the important social policy that has been violated.

Respondents contend that Petitioner fails to set forth a "clear mandate of public policy" in her amended complaint because she failed to identify specifically the public policy Respondents allegedly violated and because Maryland law does not recognize the right to counsel as a public policy exception to the employment-at-will doctrine. Respondents return to the source, *Adler*, to bolster their argument. In that case, this Court renewed its endorsement of the common law rule that at-will employees may be "legally terminated at the pleasure of either party at any time." *Adler*, 291 Md. at 35, 432 A.2d at 467. Respondents argue that *Adler* and its

---

**15.** Maryland Code (1957, 2001 Repl. Vol) Article 10, § 45B provides in relevant part,

(a) There is a need to provide equal access to the system of justice for individuals who seek redress of grievances; ... (c) There is a need to continue and expand legal assistance to those who would otherwise be unable to afford adequate legal counsel; (d) the availability of legal services reaffirms faith in our government of laws; (e) the funding of legal assistance programs for those who are unable to afford legal counsel will serve the ends of justice and the general welfare of all Maryland citizens....

"progeny" recognize a narrow exception to the employment-at-will doctrine, namely that a cause of action lies for the abusive discharge of an at-will employee only "when the motivation for the discharge contravenes some clear mandate of public policy." *Adler*, 291 Md. at 47, 432 A.2d at 473. They further contend that there is a strong presumption against the judicial creation of public policy, and cite to our opinion in *Wholey v. Sears, Roebuck and Co.*:

> While this Court has not confined itself strictly to prior judicial opinions, legislative enactments, or administrative regulations in determining the public policy of Maryland, we have, nevertheless, recognized that the establishment of "an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch."

370 Md. 38, 54, 803 A.2d 482, 491 (2002) (citing *Adler*, 291 Md. at 45, 432 A.2d at 472).

To plead successfully a cause of action for wrongful discharge, Respondents argue, a plaintiff must allege with particularity the source of public policy that was violated by the discharge. According to Respondents, Petitioner, in her amended complaint, failed to provide precise factual details to support her claim that the claimed policy was violated.

Furthermore, as their argument goes, there can be no tort for wrongful discharge when the public policy basis for the claim arises from a source that identifies its' own civil remedy. Respondents claim that the sole source of public policy relied upon by Petitioner in her amended complaint, the Federal Age Discrimination in Employment Act ("ADEA"), carries its own remedy for violations.[16] There can be no wrongful discharge suit, they argue, if the ADEA is the sole basis for the public policy that allegedly has been violated.

---

16. Respondents note that Petitioner, on appeal, abandoned her argument based on the Federal Age Discrimination in Employment Act ("ADEA"), but contend that, nonetheless, the ADEA is the only source of public policy referenced with any particularity in her amended complaint.

Additionally, Respondents contend that Petitioner's argument that she was discharged for wanting to consult an attorney regarding her employment evaluation essentially has been considered and rejected by this Court as a contravention of public policy in *Watson v. Peoples Security Life Ins. Co.*, 322 Md. 467, 588 A.2d 760 (1991). This Court held there that, absent a statute expressing a clear mandate of public policy, an employer who discharges an at-will employee in retaliation for the employee suing the employer ordinarily has not violated any public policy. *Watson*, 322 Md. at 478–79, 588 A.2d at 765. The employee in *Watson* alleged that she was discharged not only merely for consulting with an attorney, but for bringing claims against her employer. *Id.* We declined to recognize a cause of action for wrongful discharge based on those facts. *Id.* Respondents conclude that because we necessarily have addressed the issue in *Watson*, there is no reason to look to the cases of other states for guidance on the issue now before us.

Respondents analogize Petitioner's claim to that before the Court of Special Appeals in *Miller v. Fairchild Indus.*, 97 Md.App. 324, 629 A.2d 1293, *cert. denied*, 333 Md. 172, 634 A.2d 46 (1993). In *Miller*, the Court of Special Appeals determined that termination of employees by a private employer in retaliation for something said by the employees does not violate the public policy favoring free speech and thus does not give rise to a wrongful discharge claim. *Miller*, 97 Md.App. at 337, 629 A.2d at 1299. Respondents urge us to find that even if an at-will employee is found to possess a relevant constitutional right, as in *Miller*, the employee does not have a linked constitutional right to remain an employee if the employer expresses its umbrage at the exercise of the underlying right by firing the employee. Respondents characterize Petitioner's request as asking this Court to "convert public policy favoring *access* to attorneys into a public policy *mandating* that a private employer retain any employee who has notified (or alleges to have notified her employer) of her intent to discuss any work related issue (or other 'matter of

importance') with any attorney." (emphasis in original). Pursuant to this reasoning, Respondents suggest that, even though an employer can fire an employee for exercising his constitutionally protected right of free speech as in *Miller*, it would be anomalous if, in the present case, an employer could not fire an employee for exercising a right that is not similarly protected.

Respondents conclude that Maryland courts have declined to find a mandate of public policy sufficiently clear to serve as the basis of a wrongful discharge action in every state statute or regulation.[17] Instead, they argue, Maryland courts have reserved such declarations of public policy for where there is

---

**17.** Respondents recite an extensive list of cases in which Maryland appellate courts have considered whether plaintiffs have set forth public policies that could form the bases for wrongful discharge claims. The cases that have recognized a public policy suggested by a plaintiff include *Insignia Residential Corp. v. Ashton*, 359 Md. 560, 755 A.2d 1080 (2000) (allowing a wrongful discharge claim based on the theory that an employee was wrongfully discharged for refusing to acquiesce in "quid pro quo" sexual harassment in violation of Title VII of the Civil Rights Act of 1964 and Maryland Code (1957, 1998 Repl.Vol.), Article 49B); *Molesworth v. Brandon*, 341 Md. 621, 672 A.2d 608 (1996) (finding that although the public policy against employment discrimination set forth in Md.Code (1957, 1998 Repl.Vol.), Art. 49B, § 14, applies only to employers of more than 15 employees, nonetheless employers with fewer than 15 employees may be sued for wrongful discharge in violation of the public policy embodied in that statute); *Ewing v. Koppers*, 312 Md. 45, 537 A.2d 1173 (1988) (recognizing a wrongful discharge claim predicated on the theory that the employee was discharged in retaliation for filing a worker's compensation claim); *Moniodis v. Cook*, 64 Md.App. 1, 494 A.2d 212 (1985) (holding that a wrongful discharge claim exists when an employer discharges an employee for refusing to submit to a lie detector test where the statute pertaining to polygraph tests only provided a remedy for applicants for employment and not incumbent employees); *Miller v. Fairchild Indus., Inc.*, 668 F.Supp. 461 (D.Md.1987) (finding the existence of a wrongful discharge claim under Maryland law based on the theory that the employee was discharged for informing environmental authorities about the employer's violation of environmental laws).

Cases Respondents cite that did not recognize a wrongful discharge claim include: *Szaller v. Am. Nat'l. Red Cross*, 293 F.3d 148 (4th Cir.2002) (finding that because Maryland courts have given no indication that federal regulations or consent decrees constitute Maryland public policy, no wrongful discharge claim may be brought by an employee reporting violations of U.S. Food and Drug Administration

"a preexisting, unambiguous, and particularized pronouncement, by constitution, enactment, or prior judicial decision, directing, prohibiting, or protecting the conduct in question so as to make the public policy on the relevant topic not a matter of conjecture or interpretation." *Porterfield,* 142 Md.App. at 140, 788 A.2d at 245.

Respondents envision that a decision in Petitioner's favor would open the floodgates of litigation to every at-will employee who is terminated after stating an intent to seek counsel regarding a workplace situation. They predict that an employee then could be immunized from an adverse employment decision merely by stating "I am calling a lawyer." Respondents postulate further that the recognition of such a public policy mandate would erode grievously the at-will employment doctrine.

## III.

### A.

█ The employment at-will doctrine long has been part of the common law of Maryland. *McCullough Iron Co. v. Car-*

---

regulations to the employer's hotline); *Wholey v. Sears, Roebuck & Co.,* 370 Md. 38, 803 A.2d 482 (2002) (in which we found that even though a clear public policy mandate exists protecting employees from discharge based upon reporting suspected criminal activities to law enforcement authorities, termination resulting from an employee investigating his store manager's suspected criminal activity and reporting that suspicion to his supervisors did not allege facts in contravention of the public policy); *Ball v. United Parcel Serv., Inc.,* 325 Md. 652, 602 A.2d 1176 (1992) (refusing to recognize a public policy pursuant to Maryland Code (1957, 1987 Repl.Vol.), Article 27, § 562(a) which makes it a criminal offense to coerce or intimidate another person to contribute to any social, economic, or political association or organization, when an employee was terminated for failing to donate money to the United Way Fund because United Way was a charity and not a social or economic organization covered by the statute); *Chappell v. Southern Md. Hosp., Inc., et al.,* 320 Md. 483, 578 A.2d 766 (1990) (holding that when a civil remedy is provided for violations of the Maryland Fair Employment Practices Law and Maryland Minimum Wage Act, a wrongful discharge action, based on the theory that discharge was prompted by the employer's dissatisfaction with employee's questioning of employer's claimed violations of these laws, does not lie).

*penter*, 67 Md. 554, 11 A. 176 (1887). Its major premise is that an employment contract is of indefinite duration, unless otherwise specified, and may be terminated legally at the pleasure of either party at any time. *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981); *St. Comm'n on Human Rel. v. Amecom Div.*, 278 Md. 120, 126, 360 A.2d 1, 5 (1976); *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941). Onto this general rule have been grafted exceptions, some legislative and others judicially recognized. The legislatures of many states, including Maryland, have created exceptions to the terminable at-will doctrine which limit an employer's unqualified right to discharge, with or without justification, an at-will employee. *See* Maryland Code (1957, 1998 Repl.Vol.), Article 49B, § 16(a)(1) (making it unlawful to discharge an employee "because of . . . race, color, religion, sex, age, national origin, marital status, or physical or mental handicap unrelated in nature and extent so as to reasonably preclude the performance of the employment. . . ."); Maryland Code (1957, 1998 Repl.Vol.), Article 89, § 43 (providing that an employee may not be discharged for involvement in the enforcement of Maryland's Occupational Safety and Health Act); Maryland Code (1974, 1980 Repl.Vol.), Courts and Judicial Proceedings Article, § 8–105, 8–401 (stating that it is unlawful for an employer to discharge an employee for time lost because of serving on a jury). These statutory limitations on the terminable at-will employment doctrine elevate specific and direct policy interests in protecting certain rights of an employee above the right of an employer to discharge its' employee.

In *Adler*, this Court first considered a judicially-created exception to the terminable at-will doctrine to protect certain public policy interests. The public policy exception to the at-will employment doctrine holds that an employee who has been "discharged in a manner that contravenes public policy," may bring a cause of action in tort "for abusive or wrongful discharge against his former employer." *Adler*, 291 Md. at 35–36, 432 A.2d at 467. We held in *Adler* that when the termination of an employee violates some "clear mandate of public policy" an action for wrongful discharge will lie. 291

Md. at 43, 432 A.2d at 471. To find that an employer acted in a manner such as to justify a claim for wrongful discharge, there must first be a clear mandate of public policy that was contravened by the discharge. The definition of "public policy" adopted by this Court in *Adler* was:

> [p]ublic policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law.

*Adler*, 291 Md. at 45, 432 A.2d at 472 (citing *Eagerton v. Earl Brownlow*, 4 H.L. (House of Lords) Cas. 1, 196 (1853)). Consistent with a purpose of this tort, namely to provide a remedy for otherwise unremedied violations of public policy, we have been careful to "be precise about the contours of actionable public policy mandates" by confining the scope of such mandates in the wrongful discharge context to "clear and articulable principles of law." *Wholey v. Sears, Roebuck & Co., et al.*, 370 Md. at 52, 803 A.2d at 490. We acknowledged in *Adler* and elsewhere that a public policy mandate providing a basis for a wrongful discharge claim ordinarily should be derived from constitutional or statutory expressions of public policy. Because the establishment of "an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch," *Adler*, 291 Md. at 45, 432 A.2d at 472, we have strived to limit our purview to public policies "reasonably discernible from prescribed constitutional or statutory mandates." *Wholey*, 370 Md. at 54, 803 A.2d at 491.

■ Even where statutory and regulatory provisions supply a source of a public policy in the analysis of a wrongful discharge claim, if those provisions already provide an adequate and appropriate civil remedy for the wrongful discharge the claim will fail. *Makovi v. Sherwin–Williams Co.*, 316 Md. 603, 614–15, 561 A.2d 179, 185 (1989). The tort will not lie if

the statute provides a civil remedy that would render relief via a wrongful discharge action duplicative. *Wholey,* 370 Md. at 53, 803 A.2d at 490. To do so would interfere with the balancing of rights and adequacy of remedies determined by the legislature. *Id.* As we stated in *Adler,* "the declaration of public policy is normally the function of the legislative branch," and therefore, while we may recognize a cause of action in common law, the basis for that cause of action should be grounded in some clear mandate of public policy. 291 Md. at 45, 432 A.2d at 472.

The Plaintiff in *Adler*[18] claimed that he was fired by his employers in order "to conceal improprieties and illegal activities" which he might disclose at an impending high-level managerial meeting. 291 Md. at 34, 432 A.2d at 466. He claimed that his discharge was wrongful because it was motivated by the company's desire to conceal various illegal activities and the motive therefore was contrary to the public policy of Maryland. 291 Md. at 34–35, 432 A.2d at 466–67. We held, however, that, although a cause of action for wrongful discharge is recognized in Maryland common law, Adler failed to demonstrate that any clear mandate of public policy had been violated by his discharge. 291 Md. at 44, 432 A.2d at 471. The two sources of public policy upon which he relied were found to be inapposite to the alleged facts of his claim, and his amended complaint failed to demonstrate a clear mandate of public policy.[19]

---

18. The United States District Court certified the following state law questions for us to consider in *Adler:* "(1) Is a cause of action for 'abusive discharge' recognized under the substantive law of the State of Maryland?" and "(2) Do the allegations of the Amended Complaint, if taken as true, state a cause of action for 'abusive discharge' under the substantive law of the State of Maryland?"

19. The first source of public policy relied upon by Adler was a criminal statute, Maryland Code (1957, 1976 Repl.Vol.), Article 27, § 174, making it a misdemeanor for an officer or agent of a corporation to make fraudulent statements to the public or shareholders of the corporation with the intent to accomplish a fraud. The second source promoted by Adler was a general public policy against commercial bribery and the falsification of corporate records. He argued that those practices "are

In *Wholey*, we recently held that a clear statutory public policy mandate exists in Maryland that protects employees from termination for reporting suspected criminal activities to the appropriate law enforcement authorities. 370 Md. at 43, 803 A.2d at 484. We found that a clear mandate of public policy existed favoring the investigation and reporting of suspected criminal activity by relying on multiple sources to "discern that the legislature intended to preclude retaliation against those who report criminal activity." *Wholey*, 370 Md. at 62, 803 A.2d at 495. Although the legislature provided in the legislative scheme a statutory remedy for public employee-whistleblowers, it did not do so for *"private* employee-whistle-blowers." *Wholey*, 370 Md. at 57, 803 A.2d at 492 (emphasis in original). Statutory bases for public policy supporting the tort were found in Maryland Code (1957, 1996 Repl.Vol., 2001 Supp.), Article 27, § 762, making it a misdemeanor for a person to harm or injure another's person or property in retaliation for reporting a crime; and Art. 27, § 760, which defines "witness" as including a person who "makes a declaration under oath that is received as evidence for any purpose," as well as one who "has reported a crime or delinquent act to a law enforcement officer, prosecutor, intake officer, correctional officer, or judicial officer...." We concluded these provisions indicated that

> the Legislature sought to protect those witnesses *who report suspected criminal activity to the appropriate law enforcement or judicial authority* from being harmed for performing this important public task [reporting crimes to the appropriate public authorities]. From this clearly definable public policy, we are able to adopt a civil cause of action in wrongful discharge for employees who are discharged for reporting suspected criminal activity to the appropriate authorities.

---

so clearly against public policy that he need not identify any statute or rule of law specifically prohibiting such improper and possibly illegal practices." *Adler*, 291 Md. at 43, 432 A.2d at 471.

*Wholey,* 370 Md. at 59, 803 A.2d at 494 (emphasis in original). We held, however, that although a wrongful discharge action may be brought when an employer violates the public policy favoring reporting crimes to the appropriate public authorities the facts in that case did not state a violation of the policy.

In *Makovi,* this Court was asked to decide whether a wrongful discharge action lies when there is a civil remedy made available by statute. The petitioner in that case urged that although she was entitled to seek redress for her employer's actions by bringing an action pursuant to Title VII of the Civil Rights Act of 1964, and Md.Code (1957, 1986 Repl.Vol.), Art. 49B, § 14–18, she should be entitled also to redress through an action in wrongful discharge for violation of the public policies embodied in Title VII. 316 Md. at 605, 561 A.2d at 180. We held that wrongful discharge does not lie necessarily whenever the discharge is contrary to a public policy. Rather, we reasoned that

> [i]n cases of discharge motivated by employment discrimination prohibited by Title VII and Art. 49B the statutes create both the right, by way of an exception to the terminable at-will doctrine, and remedies for enforcing that exception. Thus, the generally accepted reason for recognizing the tort, that of vindicating an otherwise civilly unremedied public policy violation, does not apply. Further, allowing full tort damages to be claimed in the name of vindicating the statutory public policy goals upsets the balance between right and remedy struck by the Legislature in establishing the very policy relied upon.

316 Md. at 626, 561 A.2d at 190.

When there is no remedy provided by a statute, however, the absence of the remedy may justify vindication for violation of the public policy through a wrongful discharge action. In *Molesworth v. Brandon,* 341 Md. 621, 628, 672 A.2d 608, 612 (1996), we considered the provisions of the Maryland Fair Employment Practices Act ("FEPA") and held that Md. Code (1957, 1986 Repl.Vol.), Art. 49B, § 14 provided a sufficiently clear statement of public policy with respect to *all*

employers who discriminate based on sex,[20] despite explicit limitations on the scope of coverage of the statute. That employers of less than fifteen employees were exempted specifically from the administrative adjudicatory *process* outlined in FEPA for allegations of misconduct did not mean that such employers were exempted from the *policies* established by the Act for purposes of the wrongful discharge tort. *Id.* We therefore held that Art. 49B, § 14 provided a clear statement of public policy sufficient to support a common law cause of action for wrongful discharge against an employer otherwise excluded from the reach of FEPA's administrative process. 341 Md. at 637, 672 A.2d at 616.

We also have recognized public policy found in the common law itself. Thus, even in *Watson*, 322 Md. 467, 588 A.2d 760, we found that the interest in preserving bodily integrity was a sufficient public policy basis such that its violation gave rise to a wrongful discharge cause of action. 322 Md. at 481, 588 A.2d at 767. Petitioner in that case alleged that her supervisor had harassed her sexually and, on one occasion, sexually assaulted her by putting his hands on her shoulders and attempting to "bite her breast." *Id.* After complaining to higher supervisors who did nothing to remedy the situation, Watson filed a complaint in court and her employment was subsequently terminated. 322 Md. at 472, 588 A.2d at 762. She amended her initial complaint to allege that her discharge was as a result of filing suit. *Id.* Although we commented that an "abstract 'right of redress' " to the courts was too general a basis to satisfy the public policy element of a wrongful discharge claim, *id.* at 477, 588 A.2d at 766, we ultimately concluded that the common law right to bring a cause of action based on the occurrence or apprehension of an offensive bodily

---

**20.** That section provided in part "[i]t is hereby declared to be the policy of the State of Maryland ... to assure all persons equal opportunity in receiving employment ... regardless of race, color, religion, ancestry or national origin, sex, age, marital status, or physical or mental handicap ... [in order] to prohibit discrimination in employment by any person, group, labor organization, organization or any employer or his agents."

contact provided a basis for finding a clear mandate of public policy that was violated by Watson's discharge. 322 Md. at 472, 588 A.2d at 762. We reasoned in *Watson* that the individual's interest in preserving bodily integrity was reinforced by the state's interest in "preventing breaches of the peace" and "statutory policies intended to assure protection from workplace sexual harassment." *Id.* We concluded that although Title VII and Art. 49B prohibit retaliatory discharge for complaints about sexual harassment in the workplace, they did not provide for redress against sexual harassment that amounts to assault or battery. 322 Md. at 483, 588 A.2d at 768. Therefore, the statutory bases for the public policy did not preclude a cause of action in wrongful discharge and, acting in tandem with the earlier common law sources of public policy, the result is that "the same clear public policy which encourages Watson's legal recourse against one who degradingly assaulted her makes tortious a discharge that retaliates against that recourse." 322 Md. at 486, 588 A.2d at 769.

## B.

Count I of Petitioner's amended complaint alleged wrongful discharge. Petitioner described the "clearly mandated public policy of Maryland" violated by Respondents as follows:

> At all times pertinent hereto, the public policy of Maryland mandated that all persons be permitted freely to consult with an attorney of their choice concerning matters of importance in their lives, including matters related to their employment. One source of the foregoing public policy is Article 2 of the Declaration of Rights of the Maryland Constitution, which incorporates federal law into the law of Maryland. The federal Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. 626(f), mandates that employers who wish to negotiate an employee's release of age-discrimination claims must inform the employee of his right to confer with an attorney concerning the release.

On appeal, Petitioner discarded the Article 2 and OWBPA public policy bases, and drew instead on other common law and statutory sources to supply a clear mandate of public policy sufficient to provide a basis for her wrongful discharge cause of action. Petitioner asks us to find that the general right of access to legal counsel is a public policy that is violated when an employee is discharged for implying that she wished to consult an attorney before responding to and/or signing the acknowledgment of the unfavorable evaluation. Respondents argue that Petitioner did not plead specifically in the amended complaint the public policy basis relied upon on appeal, and therefore the grant of their motion to dismiss should be affirmed.

■ Petitioner contends that "[w]hen there is a strong public policy favoring access of all persons to legal counsel, that policy is clearly contravened when a person's employment is terminated simply because she expressed a desire to consult with an attorney." Petitioner, however, is wrong to conflate any public policy generally favoring access to counsel with a policy that is violated by the mere suggestion by an employee that he or she may want to seek advice of counsel. The possibility that an assumed right may be exercised is not the same as the actual act of exercising that right. Therefore, Petitioner's argument assumes that advice, or the desire, to consult an attorney is protected by the same public policy, if it exists, that protects the right to counsel. This is not an assumption we accept because, as Respondent suggests, the necessary extension of such a conclusion is that "an employee could be immunized from an adverse employment action by simply announcing, 'I am calling a lawyer.'" We conclude instead that Maryland law does not recognize with sufficient particularity the general right characterized by Petitioner in her amended complaint, namely "freely to consult with an attorney of [one's] choice concerning matters of importance in [one's] lives, including matters related to [one's] employment," as a clear mandate of public policy sufficient to underlie a wrongful discharge action. We further conclude that even if

we were to recognize such a public policy, the facts alleged in Petitioner's amended complaint would not offend that policy.

■ The purpose of Rule 2–322(b)(2) (motion to dismiss for failure to state a claim upon which relief may be granted) is to have legal questions decided before trial of the action on the merits. *Irvine v. Montgomery Co.,* 239 Md. 113, 210 A.2d 359 (1965). The legal question presented is whether the plaintiff alleged a legally sufficient cause of action on the face of Count I of the amended complaint. A complaint, however, is barred from presenting "technical forms of pleading," and "shall not include argument [or] unnecessary recitals of law." Maryland Rule 2–303(b) (2000). Therefore, insofar as the thrust of Respondents' argument is that the motion to dismiss was granted properly on the basis that the amended complaint failed to plead with enough specificity the sources of possible public policy, that argument is incorrect. Although Porterfield did not identify specifically all of the sources of the proffered policy in her amended complaint that she later offered on appeal, she did state clearly that the general right to counsel is the perceived policy she was relying upon as the basis to support the alleged tort. The general right to counsel policy basis underlying Petitioner's wrongful discharge allegation was patent. Respondents' argument that the motion to dismiss was granted properly because Maryland does not recognize a wrongful discharge action which uses the right to counsel as its policy basis is, however, a valid argument.

We stated in *Watson* that "absent a statute expressing a clear mandate of public policy, there ordinarily is no violation of public policy by an employer's discharging an at-will employee in retaliation for that employee's suing the employer." 322 Md. at 478, 588 A.2d at 765. It would be incongruous indeed to find that termination allegedly resulting from a suggestion the employee may seek legal advice regarding an otherwise unprotected employment matter would be a violation of public policy when termination allegedly resulting from actually commencing suit, through counsel, against an employer has been found not to violate public policy. The bases for

the public policy right to legal redress argued and rejected in *Watson* included the First Amendment to the United States Constitution, 42 U.S.C. § 1981, and Articles 19 and 40 of the Maryland Declaration of Rights. 322 Md. at 472–73, 588 A.2d at 762. Porterfield presently relies on Articles 21 and 24 of the Maryland Declaration of Rights, Md.Code (1957, 1978 Repl.Vol.), Art. 10, § 45A–O, and the common law to support her claim that there exists a public policy guaranteeing the right to legal counsel.

A purpose of the wrongful discharge tort is to address "particularly reprehensible conduct." *Ewing v. Koppers Co.*, 312 Md. 45, 49, 537 A.2d 1173, 1174 (1988). Such egregious conduct in violation of public policy is not apparent on the facts alleged by Porterfield. Absent a clear and articulable statement of public policy, we are mindful of our recognition in *Wholey* that the establishment of "otherwise undeclared public policy" is ordinarily the "function of the legislative branch." 370 Md. at 54, 803 A.2d at 491.

The cases in which we have found a clear mandate of public policy have involved expressions of public policy much stronger than those urged upon us by Petitioner. Both *Wholey* and *Molesworth* involved situations where the public policy was enunciated clearly in the relevant statutes, and applied narrowly to sets of circumstances beyond the express scope of the statutes. In *Wholey* we recognized the public policy expressed in a statute that applied exclusively to public employee-whistleblowers as permitting private employee-whistleblowers to base a wrongful discharge action on violation of the public policy. 370 Md. at 57, 803 A.2d at 492. We found that the statute reflected the public policy mandate that employees should be encouraged to report suspected criminal activities to the appropriate public authorities. 370 Md. at 43, 803 A.2d at 484. *Molesworth* involved a statute that applied to employers of more than fifteen employees and prohibited discrimination on the basis of sex. 341 Md. at 628, 672 A.2d at 612. We concluded that the statute expressed a clear mandate of public policy regarding all employers and therefore we permitted an

action to be brought in tort against an employer of fewer than fifteen employees. 341 Md. at 637, 672 A.2d at 616. No such clear mandate of public policy has been demonstrated by Petitioner.[21]

Petitioner argues in terms of a general right to counsel although the factual allegations of her amended complaint are limited to a situation where she merely announced that she had been advised to seek advice of counsel. Her asserted constitutional sources of public policy do not speak directly to the alleged facts of this case. First, Article 21 of the Maryland Declaration of Rights applies solely to criminal prosecutions and provides that every criminal defendant is "allowed counsel." In addition to a right to counsel in civil matters not being mentioned in Article 21, neither would it be of the same importance as the right in criminal matters. Heightened protections are given the criminal defendant because the penalty facing him or her upon conviction is the loss of his or her liberty, and perhaps his or her life. *Manning v. State*, 237 Md. 349, 206 A.2d 563 (1965). The right to counsel possessed by criminal defendants cannot be said rationally to create a basis for a public policy mandating that all citizens are entitled to compulsory access to counsel in "matters of importance in their lives, including matters related to their employment." Even in the criminal context, the defendant may waive the right to counsel and represent himself. *Fowlkes v. State*, 311 Md. 586, 589, 536 A.2d 1149, 1151 (1988); *Parren v. State*, 309 Md. 260, 263, 523 A.2d 597, 598 (1987); *Leonard v. State*, 302 Md. 111, 119, 486 A.2d 163, 166 (1985);

---

21. The cases from Iowa and Ohio upon which Petitioner relies are not relevant to the present matter. *Simonelli* is distinguishable from the case presently before this Court. Although the Ohio appellate court in *Simonelli* found that a wrongful discharge cause of action might lie on the basis of the public policy that citizens have a right to consult with an attorney and have that attorney contact a party with whom they have a dispute, that court did not find that the facts as alleged actually amounted to such a wrongful discharge. 650 N.E.2d at 491–92. We also agree with the Court of Special Appeals that, in this matter, the cases Petitioner relies upon from other jurisdictions are not consistent with the laws of Maryland.

*State v. Diggs,* 24 Md.App. 681, 332 A.2d 283 (1975). Second, Article 24 of the Declaration of Rights speaks even less persuasively to the present matter. Article 24 provides that "no man ought to be ... deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." While these due process provisions require notice and an opportunity to defend, they do not guarantee counsel under the circumstances alleged by Petitioner.

 Although Petitioner claims that the Maryland Legal Services Corporation Act ("Act") was passed in recognition of "the importance of the availability of counsel to all persons, regardless of income," the language of the Act rather indicates that it addresses a need to provide access to legal counsel not to all people, but specifically to those who are otherwise unable to afford it. Md.Code (1957, 2000 Repl.Vol.), Art. 10, § 45B does not guarantee everyone unrestricted access to legal counsel, but only "equal access" for those "who would otherwise be unable to afford adequate legal counsel." Furthermore, the Act is limited in effect to establishing a non-profit organization to receive and distribute funds to "grantees that provide legal assistance in noncriminal proceedings or matters to eligible clients." Art. 10, § 45D(a). The Act does not mandate access to legal counsel; rather it may be said at most to further the desirable goal of such access.

 Petitioner also avers that the mere existence of the attorney-client privilege supports her theory that the general right to counsel is an important public policy that requires vindication in this matter. Her reliance is misplaced because the attorney-client privilege does not mandate, or even necessarily favor, access to counsel. It protects the confidences of the attorney-client relationship once it is formed. The cases Petitioner refers us to only reinforce the emphasis of the attorney-client privilege on preserving the relationship once it is formed, rather than fostering directly the formation of that relationship. *See Helferstay v. Creamer,* 58 Md.App. 263, 473 A.2d 47(1984) (stating the privilege is based on the policy that

an individual who consults an attorney "should be free from apprehension of compelled disclosures by his legal advisor").

Petitioner makes the argument that she was fired either because Mascari feared Petitioner would retain a lawyer and sue her for defamation as to the content of the warning report, or because Mascari did not want to work with an employee who had consulted an attorney regarding a work dispute. Petitioner failed to demonstrate to this Court how either of these reasons for her termination would be inconsistent with the terminable at-will employment doctrine. The purpose of the public policy exception to the common law terminable at-will doctrine is quite simply to uphold the purposes and aims of our public policies. Petitioner has failed to point to any clear public policy that was violated by her termination. The alleged grounds for her termination do not implicate the public good and the relevant conduct of her employer as pled is far from being reprehensible. We agree with the Court of Special Appeals that "the violation of the general right to consult counsel is not enough. The conduct of the employer and the nature of the potential claim, if any, are relevant," therefore, "there is nothing to take this case out of the general rule expressed in *Watson*." 142 Md.App. at 142–43, 788 A.2d at 246. We hold that while Maryland law indeed may favor access to counsel, there is no sufficiently clear mandate of public policy that has been violated on the facts alleged here such that vindication by bringing a wrongful discharge action is required to protect the public interest.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

BELL, C.J., ELDRIDGE and RAKER, JJ., dissent.

ELDRIDGE, J. dissenting.

The majority holds that "there is no sufficiently clear mandate of public policy that has been violated" when an employer fires an at-will employee for stating her intent to seek advice from legal counsel regarding her rights and obligations before signing a document concerning an unfavorable work evalua-

tion. The majority asserts that the "[p]etitioner has failed to point to any clear public policy that was violated by her termination."

As I stated in my dissent in *Wholey v. Sears, Roebuck & Co.*, 370 Md. 38, 76, 803 A.2d 482, 504 (2002), "I continue to disagree with the extremely narrow scope which the majorities of this Court have repeatedly accorded the tort of abusive discharge." As a consequence of this narrow construction, "numerous discharges from employment, which are abusive and clearly contrary to public policy as a matter of common sense, are held to be beyond the scope of the tort." 370 Md. at 77, 803 A.2d at 504. Because I disagree with the majority's insistence in according an extremely narrow scope to this tort, I respectfully dissent.

Furthermore, I am astounded by the position of a majority of the members of this Court—all of whom are lawyers—that a person's right to consult with his or her own lawyer is not a clear mandate of Maryland public policy.

It is important to recognize that Deborah Porterfield was not fired because her employer believed that she performed poorly or simply because her employer did not like her. An employer ordinarily is entitled to fire an at-will employee on such grounds. Instead, Porterfield was fired because she wanted to consult with counsel before signing a document which her employer wanted her to sign.

In holding that this is a valid public policy basis for firing an at-will employee, the majority states "that Maryland law does not recognize with sufficient particularity the general right characterized by Petitioner in her amended complaint, namely, 'freely to consult with an attorney of [one's] choice concerning matters related to [one's] employment,' as a clear mandate of public policy sufficient to underlie a wrongful discharge action." Later, the majority seems to hold that the Maryland Declaration of Rights does not guarantee a right to counsel in civil matters, that "a right to counsel in civil matters [is] not ... mentioned in Article 21" and would not "be of the same importance as the right in criminal matters." The majority

goes on to hold that Article 24 of the Declaration of Rights does "not guarantee counsel under the circumstances" where one can be coerced into signing a document without legal advice.

Presumably, under the majority's holding, it would not violate public policy for an employer to, by threat of termination, coerce an employee to sign, without legal advice, an incomprehensible contract, or an unfavorable contract, or a government form, or a document containing false admissions, or a deed, or a document disposing of the employee's personal property, or a document waiving rights, etc. The notion that a Marylander, under Articles 19, 24 and 45 of the Declaration of Rights, has no right to the advice of counsel before signing such documents, is incomprehensible to me.[1]

This Court has, of course, held that the constitutional right to counsel is broader than the right to counsel under the Sixth Amendment and Article 21 of the Declaration of Rights and extends to civil matters. *See, e.g., Zetty v. Piatt,* 365 Md. 141, 155–159, 776 A.2d 631, 639–643 (2001); *Sites v. State,* 300 Md. 702, 716–718, 481 A.2d 192, 199–200 (1984); *Rutherford v. Rutherford,* 296 Md. 347, 358–363, 464 A.2d 228, 234–237 (1983) and cases there cited. *See also Goldberg v. Kelly,* 397 U.S. 254, 270–271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287, 300 (1970).

---

1. Articles 19, 24 and 45 of the Maryland Declaration of Rights provide as follows:

"**Article 19. Remedy for injury to person or property.**

"That every man, for any injury done to him in his person or property, ought to have remedy by the course of the Law of the land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay, according to the Law of the land.

"**Article 24. Due Process.**

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

"**Article 45. Reservation of rights of people.**

"This enumeration of Rights shall not be construed to impair or deny others retained by the People."

There may be no case in this Court dealing with one's right to retain his or her own counsel and obtain the advice of that counsel before signing an important document. The reason for this absence is probably because, until the case at bar, everyone assumed that such a right clearly existed. The position of the majority seems to reflect the attitude prevalent in some places, during the early history of this country, when there was substantial opposition to lawyers and where, in many places, practicing law for a fee was illegal. *See,* 1 Anton–Hermann Chroust, *The Rise of the Legal Profession in America,* pp. 27–29, 71–76, 117, 196, 211–213, 268–269 (1965). In Maryland, however, "in sharp contrast to the other colonies, there seems to have been little or no aversion to the lawyer in the beginning. As a matter of fact, it became a common practice in early Maryland, observed by parties to litigation, to appoint attorneys to attend court for them." Anton–Hermann Chroust, *supra,* at 242. From the time of John Lewger and Margaret Brent, Luther Martin and Francis Scott Key, and more recently lawyers such as Thurgood Marshall and Simon Sobeloff, the strong public policy of Maryland has clearly recognized the right to and importance of the assistance of counsel.

In my view, under Maryland public policy and the Maryland Declaration of Rights, one has a right to seek advice of his or her attorney before being forced to sign an important document. I dissent from the majority's contrary view.

Chief Judge BELL and Judge RAKER join this dissenting opinion.